## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL DIODATO,** | : | **CIVIL ACTION NO. 1:12-CV-2454** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **WELLS FARGO INSURANCE** | : | |
| **SERVICES, USA, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Presently before the court in the above-captioned matter are the motion (Doc. 63) for summary judgment by defendant and counterclaimant Wells Fargo Insurance Services, USA, Inc. ("Wells Fargo") and the motion (Doc. 66) for partial summary judgment by plaintiff and counterdefendant Darrell Diodato ("Diodato"), each pursuant to Federal Rule of Civil Procedure 56(a). These motions present manifold issues, several of which are nuanced and complex. For the reasons that follow, the court will grant in part and deny in part each motion.

## I.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. <u>See</u> FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P.

56(e); also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must

be adequate, as a matter of law, to sustain a judgment in favor of the non-moving

party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R.

CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.

Pappas, 331 F. Supp. 2d at 315.

## II.    **Statement of Material Facts**[1]

Darrell Diodato ("Diodato") was employed by Wells Fargo Insurance

Services USA, Inc. ("Wells Fargo") and its predecessor entities for thirty-six years

as an insurance producer.  (Doc. 65 ¶ 3; Doc. 73 ¶ 3).  In that role, Diodato serviced

existing insurance business and originated new insurance business.  (Doc. 65 ¶ 4;

Doc. 73 ¶ 4).  Wells Fargo paid Diodato an annual salary of approximately $230,000,

provided benefits, and purportedly covered his overhead costs and business

expenses.  (Doc. 65 ¶¶ 5-8; Doc. 73 ¶¶ 5(a)).  Diodato contends that he paid certain

business expenses directly, without reimbursement, including: (1) contributions to

support fundraising activities; (2) funds to entertain business contacts at annual

meetings of the Bowling Proprietors Association of Pennsylvania ("BPAP") and the

Bowling Proprietors Association of America ("BPAA"); (3) a $12,000 annual

deduction from his gross commission revenue to account for costs relating to the

annual endorsement of the BPAP; and (4) various amounts paid to maintain the

---

[1] To the extent facts are undisputed or supported by record evidence, the court cites directly to the parties' statements of material facts.

goodwill of the two Wells Fargo account executives ("AEs") who supported him. (Doc. 73 ¶ 6).

Diodato specialized in brokering insurance for bowling alleys and family entertainment centers. (Doc. 65 ¶ 10; Doc. 73 ¶ 10). Diodato developed "numerous personal and business relationships with owners of family entertainment centers (including bowling centers)" and considers himself to be "the godfather" of the bowling alley insurance industry. (Doc. 65 ¶¶ 10-11; Doc. 73 ¶¶ 10-11). Diodato also developed relationships with the principals of four other entities who were insured as part of a captive insurance program: Caretti, Inc., Sun Motor Cars, Inc., United Drilling, Inc., and Meckley Limestone Products, Inc. (Doc. 73 ¶ 10). Throughout his employment, Diodato gained an encyclopedic knowledge of bowling center operators and their specific insurance needs and risk management issues. (Doc. 65 ¶ 14; Doc. 73 ¶ 14). Diodato testified that approximately seventy percent (70%) of the revenue he generated was derived from bowling center owners and operators. (Doc. 65 ¶ 15; Doc. 73 ¶ 15).

At the request of his supervisor, James Voltz ("Voltz"), Diodato executed the Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions (the "TSA") subject to this litigation on December 17, 2009. (See Doc. 65 ¶ 18; Doc. 73 ¶ 18; see also Doc. 65-3, Diodato Dep. Ex. A at 1-3, July 3, 2013 ("Diodato Dep.")). Diodato simultaneously executed the Wells Fargo Producer Plan ("Producer Plan"). (See Doc. 65 ¶ 19; see also Diodato Dep. Ex. E)). According to Diodato, Voltz forced him to sign the TSA and Producer

Plan without an opportunity to review them and verbally represented that: (1) all

producers were required to sign the TSA; (2) that Diodato would be terminated if

he did not sign the TSA; and (3) that Diodato would receive one percent (1%)

additional compensation for his entire book of business.  (Doc. 73 ¶ 18(a)).

Ostensibly, at least one producer, John Ford, was not required to execute a TSA.

(See Doc. 73 ¶ 45(a)).

The TSA identifies the consideration supporting the agreement as follows:

"continued employment by a Wells Fargo company . . . , the ability to participate in

a new compensation plan containing new and additional benefits which include,

but are not limited to, a guaranteed draw and an increased commission percentage

for new and net new revenue generated in 2010."  (Diodato Dep. Ex. A at 1).  The

TSA also contains a confidentiality and non-disclosure provision.  This provision

expressly identifies the following information as falling within the ambit of

protected trade secrets: "the names, address, and contact information for any of

the Company's customers and prospective customers, as well as other personal or

financial information relating to any customer or prospect."  (Id.)  The TSA further

contains a non-solicitation provision, which provides, in pertinent part:

> I agree that for a period of two (2) years immediately
> following termination of my employment for any reason, I
> will not do any of the following, directly or indirectly or
> through associates, agents, or employees:
>
> * * *
>
> b.    solicit, participate in or promote the
>       solicitation of any of the Company's clients,

4

customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

c.   Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

i.    with whom I had Material Contact, and/or

ii.   were clients or customers of the Company within six (6) months prior to my termination of employment.

This two-year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two-year period.

(Id. at 2).  The TSA contains an integration clause acknowledging that the document constitutes the entire agreement between the parties and is a final expression of their collective intent.  (Id. at 3).  It explicitly states that Diodato's employment with Wells Fargo is "at will," and that the TSA does not alter or modify his employment status.  (Id. at 3).  The companion Producer Plan identifies the "TSA Consideration" as follows: "For the 2010 Plan year only (January 1, 2010, through December 31, 2010), Participant will receive the following consideration

for signing the new TSA for [Wells Fargo]: Additional 1% on New Revenue and

Additional 1% on Net New Revenue." (<u>Id.</u> Ex. E at 1). The Plan defines "Net New

Revenue" as "new revenue recorded in 2010 less lost business." (<u>Id.</u>)

On April 27, 2011, Wells Fargo placed Diodato on administrative leave with

pay, and on May 16, 2011, terminated his employment. (<u>See</u> Doc. 65 ¶¶ 37, 41; Doc.

73 ¶¶ 37(a), 41). Unsurprisingly, the parties offer drastically different accounts as to

the reasons for Diodato's discipline and ultimate termination. Diodato alleges that

the TSA and Producer Plan were never a condition of producer employment with

Wells Fargo. He contends that these agreements were part of an elaborate scheme

by Wells Fargo to end his employment <u>and</u> eliminate Diodato's access to his book of

business. (Doc. 73 ¶ 18). According to Diodato, Voltz's end game was to increase

profitability by shedding Diodato's salary while retaining revenues from his original

book of business. (<u>Id.</u> ¶ 18(c)). The court notes that the only evidence supporting

this version of events is Diodato's declaration. (<u>See id.</u> (citing Doc. 73-1, Diodato

Dec. ¶¶ 18-24 ("Diodato Dec. II")).

Contrarily, Wells Fargo asserts that Diodato brokered business without a

properly executed brokerage agreement, solicited insurance business without a

license, bound insurance coverage without the proper documentation, attempted to

issue "dummy invoices", and instructed staff to disregard rules, all in violation of

Wells Fargo's company policy. (Doc. 65 ¶ 27; Doc. 65-6, Voltz Dep. Ex. 40 July 12,

2013 ("Voltz Dep.") (formal disciplinary notice identifying concerns)). In a formal

warning letter to Diodato, Voltz also asserts that Diodato disrupted sales meetings "with abrasive and angry comments." (Id.)

Wells Fargo identifies an April 2011 incident as the final trigger for its decision to terminate Diodato. (Doc. 65 ¶ 29). According to Wells Fargo, Diodato forged the signature of Sun Motor Cars' ("Sun") chief financial officer on a warranty form appended to Sun's insurance application, warranting that vehicles valued over $75,000 would be garaged overnight. (Id. ¶¶ 29-31). Diodato concedes that he signed the form as Sun's chief financial officer, but he claims that he simply sought to obtain a quote for Sun's insurance coverage. (See Doc. 73 ¶¶ 30-31). He flatly denies that his actions constitute "forgery," noting that Sun's officer ultimately signed the final application before coverage was bound. (See id.) The issue of the forged signature came to the surface when a luxury vehicle was stolen from Sun's outdoor lot in April of 2011. (Id. ¶ 33). The insurer denied coverage because Sun did not garage the vehicle as warranted. (Id. ¶¶ 30, 33). Wells Fargo eventually reimbursed Sun for the $82,107 loss in lieu of the booked insurance. (See id. ¶ 34). Wells Fargo thereafter placed Diodato on administrative leave. (Id. ¶ 37). Following an audit in which many of Diodato's accounts scored poorly,[2] Wells Fargo terminated his employment on May 16, 2011. (See Doc. 65 ¶¶ 39-41; Doc. 67 ¶ 3).

---

[2] Diodato devotes much of his responsive statement of facts to the internal audit of his accounts and the legitimacy of the audit process. (See Doc. 73 ¶¶ 39-40)). The court ultimately concludes that the circumstances surrounding Diodato's administrative leave and termination are largely irrelevant to the claims he asserts. See infra at 17 n.7, 26-30. Hence, the court will not address these issues.

Following Diodato's termination, Wells Fargo generated and distributed to its clientele approximately fifty three (53) insurance-related documents which identified Diodato as the producer on their respective accounts.  (See Doc. 65 ¶ 48; Doc. 73 ¶ 48).  Wells Fargo continued to run advertisements in Roller Skating International Association's magazine, *Roller Skating Business*, using Diodato's name until at least February of 2012 and continued to identify him as a producer on the Wells Fargo website months after his termination.  (Doc. 73 ¶ 49).  Diodato did not consent to the continued use of his name by Wells Fargo.  (Id.)  On July 20, 2011, Wells Fargo issued a letter to Diodato's former clients advising of a "personnel change" and informing them that Diodato's AEs, Kay Plank ("Plank") and Noreen McKendrick ("McKendrick"), "have a combined 35 years of experience with bowling alley clients" and "are still here to work with you."[3]  (Doc. 65 ¶¶ 52-55; Doc. 73 ¶ 52).  Diodato personally advised his non-bowling industry accounts that he was no longer with Wells Fargo.  (Doc. 65 ¶ 57; Doc. 73 ¶ 57).

In approximately July of 2011, Diodato began working with Christian Baker Company ("Christian Baker"), a competitor of Wells Fargo.  (Doc. 67 ¶ 45; Doc. 77 ¶ 45).  Diodato remained with Christian Baker from July of 2011 until "early 2013," when he began working for American Insurance Administrators, Inc. ("AIA"), another competitor of Wells Fargo.  (See Doc. 67 ¶¶ 45-46; Doc. 77 ¶¶ 45-46).  In his

---

[3] At the time of Diodato's departure, Plank and McKendrick were the only other Wells Fargo employees to service bowling industry accounts.  (Doc. 65 ¶ 56; Doc. 73 ¶ 56).

declaration, Diodato "denies that he solicited contacts that he previously managed at [Wells Fargo]" but also "freely acknowledges that he maintained long-standing personal connections with many of his contacts and regards many of these persons as personal friends." (Doc. 67 ¶¶ 47-48; Doc. 77 ¶¶ 47-48). Diodato admits that many of the clients he serviced at Wells Fargo "left or removed their accounts from [Wells Fargo] in the period following [his] termination." (Doc. 67 ¶ 51; Doc. 77 ¶ 51). He also acknowledges that some of these customers asked him how to transfer their business from Wells Fargo to another broker. (Doc. 67 ¶ 54; Doc. 77 ¶ 54). Diodato does not deny that he was in regular business-related contact with his Wells Fargo customers throughout the duration of the non-solicitation period. (See Doc. 67 ¶¶ 65-69; Doc. 77 ¶¶ 65-69 (citing *inter alia* Doc. 75, Ex. A, Diodato PP (email response to Diodato from client noting that he "sent that request for transfer to Wells Fargo as you had asked"))). Wells Fargo sent cease and desist letters to Christian Baker and AIA in September of 2011 and September of 2012, informing both firms of Diodato's breach of the TSA and demanding that each ensure Diodato's compliance with the TSA's terms. (See Doc. 67-6 at 12-27). As of June 2013, approximately seventy three (73) of Diodato's former accounts had transferred to another broker. (Doc. 67 ¶ 73; Doc. 77 ¶ 73).

## III.   Procedural History

Diodato commenced this civil action by filing an eleven (11) count complaint (Doc. 1-2) on November 9, 2012, in the Court of Common Pleas for Cumberland County, Pennsylvania. Wells Fargo timely removed the litigation to this court on

December 10, 2012, pursuant to 28 U.S.C. § 1446, (Doc. 1), and filed an answer and

counterclaim (Doc. 5)[4] on December 17, 2012.  Diodato filed an answer (Doc. 9) to

Wells Fargo's counterclaim on January 16, 2013.  After a period of discovery, and

several discovery disputes addressed by Chief Magistrate Judge Martin C. Carlson,

both parties moved for summary judgment.  (Docs. 63, 66).  The motions are fully

briefed (Docs. 64, 68, 74, 75, 79, 80) and supplemented by lengthy statements and

counterstatements of fact.  (Docs. 65, 67, 73, 77).  This matter is ripe for disposition.

III.   **Discussion**

   A.   **Wells Fargo's Motion for Summary Judgment**

   Diodato asserts the following eleven claims in his complaint: fraudulent

misrepresentation and inducement (Count I); breach of contract – good faith and

fair dealing (Count II); breach of contract (Count III); violation of Pennsylvania's

Wage Payment and Collection Law ("WPCL"), 43 PA. STAT. § 260.1 *et seq.* (Count

IV); defamation (Count V); commercial disparagement (Count VI); unauthorized

use of name or likeness in violation of 42 PA. CONS. STAT. § 8316 (Count VII); unjust

enrichment (Count VIII); declaratory judgment (Count IX); unfair competition

(Count X); and violation of 15 U.S.C. § 1125 (the "Lanham Act") (Count XI).  Wells

Fargo moves for summary judgment as to each claim, asserting that the record is

---

   [4] Wells Fargo's answer and counterclaim appears twice on the docket, at
Docket Entries No. 5 and No. 10.  The two pleadings appear to be identical.  To the
extent necessary, the court will refer to the first-filed answer and counterclaim at
Docket Entry No. 5.

devoid of evidence supporting Diodato's theories of liability and that it is entitled to judgment as a matter of law.

### 1.   *Count I: Fraudulent Inducement*

The gravamen of Diodato's fraudulent inducement claim[5] is that Wells Fargo induced him to sign the TSA as a precursor to termination of his employment and cutting off access to his long-time clients. (Doc. 1-2 at ¶¶ 102-19). In other words, Diodato contends that Wells Fargo fraudulently induced him to agree to the restrictive TSA and "actively concealed" its intent to terminate his employment thereafter. (Id. ¶ 108). Wells Fargo argues that the fraudulent inducement claim is a misguided, transparent attempt by Diodato to circumvent Pennsylvania's at-will employment doctrine and to assert an otherwise prohibited claim for wrongful termination. (Doc. 64 at 13). Wells Fargo also posits that Diodato has adduced no evidence of fraud or fraudulent intent, and that the gist of the action and economic loss doctrines bar his claim. (Id.)

At the outset, the court rejects Wells Fargo's argument with respect to at-will employment. Wells Fargo is correct that the courts of the Commonwealth generally adhere to the employment at-will doctrine, which allows employers to terminate employees "for any reason or for no reason" unless a contract between the parties

---

[5] In his complaint, Diodato asserts claims for both fraudulent inducement *and* fraudulent misrepresentation. (See Doc. 1-2 at 22). In his brief in opposition to Wells Fargo's motion, Diodato pursues only a fraudulent inducement claim. (See Doc. 74 at 9-16). Consequently, the court deems any claim for fraudulent misrepresentation to be waived.

provides otherwise.  <u>Pipkin v. Pa. State Police</u>, 693 A.2d 190, 191 (Pa. 1997) (quoting

<u>Stumpp v. Stroudsburg Mun. Auth.</u>, 658 A.2d 333, 335 (Pa. 1995)); <u>see</u> <u>also</u> <u>Fraser v.</u>

<u>Nationwide Mut. Ins. Co.</u>, 352 F.3d 107, 111 (3d Cir. 2003) (noting the general rule in

Pennsylvania that "at-will employees may be terminated for any reason or for no

reason . . . [unless] doing so would offend . . . public policy").  The doctrine does not

bar *every* claim arising from at-will employment relationships; rather, it precludes

only those claims arising from the decision to terminate the employee.  <u>See</u> <u>Martin</u>

<u>v. Hale</u>, 699 A.2d 1283, 1287 (Pa. Super. Ct. 1997).  Pennsylvania courts have held,

for example, that tort claims arising independently of the decision to terminate

employment are not barred by the at-will employment doctrine.  <u>E.g.</u>, <u>id.</u> at 1287

(observing that "a torts action grounded on an assertion of fraudulent inducement

to accept employment is distinct from and does not depend upon a wrongful

discharge claim or breach of employment contract claim") (citing <u>Lokay v. Lehigh</u>

<u>Valley Cooperative Farmers, Inc.</u>, 492 A.2d 405, 418 (1985)).  Diodato challenges not

only his termination, but also representations purportedly made to induce him to

agree to the TSA.  His theory of fraud liability falls squarely within this established

exception.  (<u>See</u> Doc. 74 at 13 ("Rather, Count I alleges that [Wells Fargo] made

fraudulent inducements to obtain [Diodato's] signature on the TSA, which [Wells

Fargo] then used as an improper restraint against his ability to engage in lawful

employment.")).

    That the claim is not barred outright does not end the court's inquiry,

however, because Wells Fargo also lodges a three-fold attack at the merits of the

fraudulent inducement claim, contending: first, that the gist of the action and
economic loss doctrines bar the claim; second, that Diodato fails to adduce
evidence of fraud; and third, that the parol evidence rule precludes admission of the
evidence Diodato does cite.  Because the court concludes that Diodato's fraudulent
inducement claim sounds in contract and is barred by the gist of the action
doctrine, the court will not address Wells Fargo's remaining arguments.

For breach of a contract to constitute an actionable common law tort, the
allegedly tortious conduct at issue "must be the gist of the action, the contract
being collateral."  eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super.
Ct. 2002).  The gist of the action doctrine bars a tort claim when (1) the claim arises
from a contract between the parties; (2) the duties breached were created by the
contract; (3) liability derives from the contract; or (4) the success of the tort claim is
wholly dependent upon the contract's terms.[6]  Id. at 19.  When applying the gist of
the action doctrine, the Pennsylvania Superior Court has explained that "a claim
should be limited to a contract claim when 'the parties' obligations are defined by
the terms of the contracts, and not by the larger social policies embodied by the law
of torts.'"  Id. at 14 (quoting Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247
F.3d 79, 104 (3d Cir. 2001)).  In other words, the court must inquire as to the source
of the duties allegedly breached: "if the duties in question are intertwined with

---

[6] The Pennsylvania Supreme Court has not expressly adopted the gist of the
action doctrine, but the Third Circuit Court of Appeals and Pennsylvania Superior
Court have predicted that it will do so.  See Williams v. Hilton Group, PLC, 93 Fed.
App'x 384, 385-86 (3d Cir. 2004) (unpublished); eToll, 811 A.2d at 14.

contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." Knit With v. Knitting Fever, Inc., 2009 U.S. Dist. LEXIS 98217, *13-14 (E.D. Pa. Oct. 20, 2009) (quoting Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., No. 06-3957, 2006 U.S. Dist. LEXIS 78890, at *2 (E.D. Pa. Oct. 30, 2006)).

Diodato cites Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710 (Pa. Super. Ct. 2005) for the proposition that the gist of the action doctrine does not operate to "bar a fraud claim stemming from the fraudulent inducement to enter into a contract." (Doc. 74 at 14 (citing Sullivan, 873 A.2d at 719)). Diodato ignores a crucial caveat in the Sullivan decision: the Commonwealth's Superior Court did not find that the doctrine is categorically inapplicable to fraudulent inducement claims; rather, the court observed that the gist of the action doctrine "*would not necessarily* bar a fraud claim stemming from the fraudulent inducement to enter into a contract." Sullivan, 873 A.2d at 719 (citing eToll, 811 A.2d at 19) (emphasis added). As a consequence of this equivocal language, case law as developed in the wake of eToll and Sullivan is less than pellucid. As one court recently observed, "[t]he most that can be said of the case[]law in this area is that the gist-of-the-action doctrine will not *always* bar a fraudulent inducement claim." Guy Chem. Co. v. Romaco N.V., No. 3:06-96, 2007 U.S. Dist. LEXIS 4287, at *17 (W.D. Pa. Jan. 22, 2007) (emphasis added).

This court recently had the opportunity to analyze the current state of this area of law in Agrotors, Inc. v. Ace Global Markets, No. 1:13-cv-1604, 2014 U.S. Dist.

LEXIS 22560, at *11-13 (M.D. Pa. Feb. 22, 2014) (Conner, C.J.).  Rejecting Agrotor's

position that all fraudulent inducement claims are necessarily collateral to the

contract, the court observed that, in reality, "the state of the case law is much more

complex."  Id. at *11.  In Agrotors, this court adopted the comprehensive analysis of

the doctrine undertaken by the Honorable Stewart Dalzell in Vives v. Rodriguez,

849 F. Supp.  2d 507 (E.D. Pa. 2012), summarizing that decision as follows:

> In Vives, the court recognized that the Pennsylvania
> Superior Court has adopted a bright line rule providing
> that the "gist of the action" doctrine bars claims of fraud
> in the performance of a contract but does not bar claims
> for fraud in the inducement.  However, the Vives court
> also recognized that the Third Circuit, as well as district
> courts within the Third Circuit, have determined that the
> "gist of the action" doctrine may bar claims for fraud in
> the inducement "where the false representations
> concerned duties later enshrined in the contract."
> These federal cases also warned against any reliance on
> the distinction between fraudulent inducement and
> fraudulent performance claims, instead emphasizing
> that the doctrine requires a fact-intensive analysis.  The
> Vives court ultimately sided with the authority within the
> Third Circuit and predicted that the Pennsylvania
> Supreme Court would find that the "gist of the action"
> doctrine bars fraudulent inducement claims based upon
> "misrepresentations as to a party's intent to perform
> under a contract."

Agrotors, 2014 U.S. Dist. LEXIS 22560, at *11-13 (citing Vives, 849 F. Supp. 2d at

518-20).  Other district courts within the Third Circuit Court of Appeals have

adopted the Vives decision.  See Irish Isle Provision Co., Inc., v. Polar Leasing Co.,

Inc., No. 4:12-cv-00778, 2013 U.S. Dist. LEXIS 164349, at *14-18 (M.D. Pa. Nov. 19,

2013); Oldcastle Precast, Inc., v. VPMC, Ltd., No. 12-6270, 2013 U.S. Dist. LEXIS

67481, at *27-30 (E.D. Pa. May 13, 2013); <u>Bengal Converting Servs. v. Dual Printing,</u> <u>Inc.</u>, No. 11-6375, 2012 U.S. Dist. LEXIS 33156, at *8-11 (E.D. Pa. Mar. 12, 2012). Neither the Pennsylvania Supreme Court nor the Third Circuit has ruled otherwise since this court's decision in <u>Agrotors</u>.

Hence, the court must examine the relationship between Diodato's simultaneously pleaded fraudulent inducement and contract claims and determine whether the two are "interwoven," precluding his tort claim, or whether the fraud claim is "collateral" to the TSA.  <u>See</u> <u>Bengal</u>, 2012 U.S. Dist. LEXIS 33156, at *10 ("In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort.") (citing <u>Sunburst Paper</u>, 2006 U.S. Dist. LEXIS 78890, at *2).  Viewed thusly, the doctrine bars Diodato's fraudulent inducement claim.  Diodato contends that Voltz induced him to sign the TSA by representing that: (1) Wells Fargo producers were required to sign the TSA as a condition of their continued employment, and (2) as consideration for the TSA, Diodato would receive an additional one percent (1%) payment on the commissions from his 2009

book of business.[7]  (See Doc. 74 at 10-11; Diodato Dec. ¶¶ 18-19).  Each of these representations is expressly addressed by the plain terms of the TSA and Producer Plan.  (Diodato Dep. Ex. A at 1 (acknowledging TSA is executed "[i]n consideration for my continued employment by a Wells Fargo company"); Ex. E at 1 ("For the 2010 Plan year only (January 1, 2010 through December 31, 2010), [Diodato] will receive the following consideration for signing the new TSA . . . : Additional 1% on New Revenue and Additional 1% on Net New Revenue.")).  These representations similarly are integral to Diodato's breach of contract claim.  (See Doc. 1-2 ¶¶ 128-34 (alleging that the Producer Plan provided, and Voltz promised, that Diodato would receive additional one percent (1%) payment and that Wells Fargo failed to make said payment, in breach of its contract)).

In fact, Diodato's fraudulent inducement claim is not based on a single representation that is not contemplated by his breach of contract claim.  In other words, nothing in the record establishes that Wells Fargo made a representation beyond the scope of the TSA.  Cf. Williams, 93 F. App'x at 386 (when defendants

---

[7] Diodato alternatively contends that Wells Fargo concealed its discretionary authority to terminate Diodato at the time he signed the TSA, providing another basis for his claim.  (See Doc. 74 at 10).  The court rejects this argument.  Diodato concedes his employment was at will.  (Diodato Dep. 40:17-41:18, (acknowledging that employment with Wells Fargo was at will and that nothing in the TSA modified his at-will employment status)).  Further, the TSA expressly states that Wells Fargo retains the right to terminate Diodato's employment at any time, for any reason. (Diodato Dep. Ex. E at 5 (Producer Plan expressly disclaiming any contract of employment and restating that employment is at will)).  Therefore, Diodato's argument that Wells Fargo falsely concealed its right to terminate him at its discretion is unavailing.

induced plaintiffs to buy gaming assets for a set price on an exclusive basis while

secretly marketing to other buyers, fraud in the inducement claim sounds in

contract and is barred by gist of the action doctrine); Plexicoat Am., LLC v. PPG

Architectural Finishes, Inc., No. 2:13-cv-3887, 2014 U.S. Dist. LEXIS 38114, at *9-10

(E.D. Pa. Mar. 21, 2014) (observing that gist of the action doctrine bars fraudulent

inducement claim unless "pre-contractual statements were outside the scope of the

eventual contract"); Irish Isle Provision Co., 2013 U.S. Dist. LEXIS 164349, at *17

(dismissing fraudulent inducement claim when statements "do not demonstrate a

relationship collateral to the contract as required to survive the gist of the action

doctrine"); Penn City Invs., Inc. v. Soltech, Inc., No. 01-5542, 2003 U.S. Dist. LEXIS

22321 (E.D. Pa. Nov. 25, 2003) (when "pre-contractual statements concerned specific

duties that the parties later outlined in the contract," doctrine bars fraudulent

inducement claim).  Measured against this authority, the court concludes that

Diodato's breach of contract claim subsumes any separate claim for fraudulent

inducement.  The court will grant summary judgment to Wells Fargo with respect

to Count I.

> **2.    _Counts II & III: Breach of Contract & Breach of the Duty of Good Faith & Fair Dealing_**

Diodato sets forth two contract claims in his complaint: one for breach of the

terms of the TSA, and one for breach of the TSA's implied duty of good faith and

fair dealing.  (Doc. 1-2 ¶¶ 120-36).

To prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must prove the following: (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach. See Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Diodato asserts that Wells Fargo breached the TSA by failing to pay him earned compensation subsequent to his termination and by enforcing the agreement in bad faith. The court will address each of the alleged breaches in turn.

### a.    Failure to Make Payments

Diodato contends that Wells Fargo failed to compensate him as required by the TSA. He specifically alleges that Wells Fargo failed to pay him a guaranteed draw, increased commission for new revenue and net new revenue generated in 2010, and an "additional one percent (1%) payment." (See Doc. 1-2 ¶¶ 131-34). Wells Fargo responds that undisputed record evidence establishes that Diodato was paid in accordance with the Producer Plan and that it is entitled to summary judgment on this claim. (Doc. 64 at 19-20). Wells Fargo cites the deposition testimony of John Kluxen, a Wells Fargo employee, who reviewed Diodato's paycheck dated March 18, 2011, and testified that Diodato received a $1,186.79 payment on that date, representing one percent (1%) of new and net new revenue generated by accounts he serviced in 2010. (See Doc. 65-5, Kluxen Dep. 71:5-74:10, May 31, 2013 ("Kluxen Dep.")).

Diodato does not respond to this evidence or otherwise support the allegations of his complaint in opposition to Wells Fargo's motion. (See Doc. 74 at 22-26). Courts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended. See Nissan World, LLC v. Mkt. Scan Info. Sys., No. 05-2839, 2014 U.S. Dist. LEXIS 59902, at *31 (D.N.J. Apr. 30, 2014) ("Failing to raise an argument in opposition to a motion for summary judgment constitutes a waiver of that argument."); Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 558 n.15 (M.D. Pa. 2008) (deeming abuse of process and emotional distress claims to be "abandoned" and granting summary judgment to defendants when counsel failed to respond to arguments raised against those claims) (citing Smith v. Lucas, No. 4:05-cv-1747, 2007 U.S. Dist. LEXIS 39655, at 10 (M.D. Pa. May 31, 2007) (holding that plaintiff abandoned claims by failing to respond to them in opposition to summary judgment); Clarity Software, LLC v. Allianz Life Ins. Co. of N. Am., No. 2:04-cv-1441, 2006 U.S. Dist. LEXIS 56217, at *5 (W.D. Pa. Aug. 11, 2006) (same); Cacciatore v. Cnty. of Bergen, No. 02-1404, 2005 U.S. Dist. LEXIS 37568, at *1 n.1 (D.N.J. Dec. 30, 2005)). In the exercise of caution, the court notes that the record is devoid of *probata* in support of the *allegata*. See Morris v. Orman, No. 87-5149, 1989 U.S. Dist. LEXIS 1876, at *8 (E.D. Pa. Mar. 1, 1989) (emphasizing that "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment") (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)).

Thus, Diodato's breach of contract claim, as articulated in his complaint, fails to survive summary judgment.

In lieu of defending the allegations of his complaint, Diodato articulates an amended claim for breach of contract in his opposition brief, contending for the first time that Wells Fargo failed to pay more than one year's worth of commission due upon his termination and failed to reimburse him for work-related expenses. (See Doc. 74 at 22 (alleging that Wells Fargo terminated Diodato when "approximately one year of his past commissions had been lawfully earned but unpaid" and "his expenses for April 2011 . . . were on his desk . . . and never provided to him despite demand")).

It is well-settled that Diodato "may not amend his complaint in his brief in opposition to a motion for summary judgment." Bell v. City of Phila., 275 F. App'x 157, 160 (3d Cir. 2008) (non-precedential) (citing Shanahan v. City of Chi., 82 F.3d 776, 781 (7th Cir. 1996)).[8]  With reliance on Bell, district courts within the Third Circuit routinely reject such attempts.  See, e.g., Ripple v. Olympic Steel, Inc., No. 12-cv-2234, 2014 U.S. Dist. LEXIS 17528, at *5-6 (M.D. Pa. Feb. 10, 2014) (rejecting attempt to transform actual disability claim under the Americans with Disabilities Act into perceived disability claim at summary judgment as a "failed attempt . . . to change horses midstream"); Thomas v. East Orange Bd. of Educ., No. 1:12-1446,

---

[8] The court acknowledges that Bell is a non-precedential decision but is nonetheless persuaded by the panel's *ratio decidendi* and the policy considerations underlying the same.

2014 U.S. Dist. LEXIS 14745, at *21 (D.N.J. Feb. 6, 2014) (plaintiff cannot assert an aiding and abetting discrimination claim for the first time in her opposition to motion for summary judgment); Duran v. Merline, 923 F. Supp. 2d 702, 723-24 (D.N.J. 2013) (summary judgment appropriate on access to courts claim when plaintiff attempted to cite two additional instances of misconduct in opposition brief which were absent from plaintiff's complaint); Boles v. City of Phila. Water Dep't, No. 06-1609, 2010 U.S. Dist. LEXIS 50686, at *18 (E.D. Pa. May 21, 2010) (plaintiff may not transform disparate treatment claim into retaliation claim through brief opposing summary judgment); see also Baklayan v. Ortiz, No. 11-3943, 2012 U.S. Dist. LEXIS 115712, at *9 (D.N.J. Aug. 15, 2012) (applying Bell to Rule 12(b)(6) motion to dismiss).  Summary judgment is appropriate for this reason alone.

Notwithstanding Bell, Diodato fails to offer evidence which, if accepted by the jury, establishes that Wells Fargo breached a payment obligation under the TSA.  Diodato acknowledges that the Producer Plan governed his compensation structure during his tenure with Wells Fargo and that the Plan provides: "Credited Commissions are deemed earned once the Participant's Eligible Revenue has been collected by [Wells Fargo]."  (Doc. 73 ¶ 5(d)).  According to the Plan, "[c]ommission payments earned under the Plan will be made within 45 days after the Participant's payment period ends" and that "payments earned . . . must be made to the Participant no later than March 15th after the end of the Plan year."  (Diodato Dep. Ex E at ¶ 5(E)).  The Plan further states that terminated participants "will be paid

Credited Commissions earned through the Participant's termination date less any Draw paid."  (Id. at ¶ 6(A)).

Diodato alleges that Wells Fargo failed to pay him "approximately" one year of past commissions in addition to "estimated" expenses of $750.  (Doc. 74 at 22). He cites to his own declaration, wherein he states that Wells Fargo's commission payment structure was contrary to the terms of the Producer Plan and that Wells Fargo collected commission-eligible revenue for his accounts up to a year before remitting payment to Diodato.  (Diodato Dec. ¶¶ 10-12).  According to Diodato, when Wells Fargo ceased paying him in May of 2011, two elements of his compensation remained unpaid: Diodato's share of commissions collected by Wells Fargo in 2010 but not paid in 2011, and all commissions collected by Wells Fargo in 2011 until Diodato's termination date.  (Id.)  Yet, Diodato directs the court to no evidence other than his own affidavit to support his position.[9]

Diodato also argues that Wells Fargo must reimburse him for an estimated $750 in expenses.  (Doc. 74 at 24 (citing Diodato Dec. 2 ¶ 60)).  The Producer Plan provides that Wells Fargo will reimburse its producers for "reasonable business,

---

[9] In support of his claim that Wells Fargo received revenue up to a year before remitting his commission, Diodato contends that "the insurance industry as a commercial practice pays agency commissions at the outset of the coverage year," which, coupled with the Plan language and "[Wells Fargo's] practice of paying those commissions one year in arrears, leaves [Wells Fargo] liable to pay approximately one year of commission upon a broker's termination." (Doc. 74 at 25).  The record is devoid of evidence with respect to both insurance industry practices in general and the particular practices of Wells Fargo.  Hence, Diodato's theory is wholly unsupported by record evidence.

travel and entertainment expenses" subject to its reimbursement and auto policies

with prior management approval. (Diodato Dep. Ex. E at ¶ 5(E)). Wells Fargo

admits that it often reimbursed Diodato for business expenses. (See Doc. 65 ¶ 8).

As a result, it is plausible that Wells Fargo may, under certain circumstances and

assuming requisite proof, be liable to Diodato for breach of contract for failure to

reimburse expenses. (Id.) Diodato contends that "the information that would

substantiate [his expenses] was on his desk as of his last day at [Wells Fargo] and

[Wells Fargo] has refused to provide the same to him." (Diodato Dec. ¶ 60). Wells

Fargo notes—and Diodato does not refute—that Diodato never sought any such

documents in his fifty-eight (58) separate requests for documents. (See Doc. 64 at

23 n.5).

On this matter, the court concludes that Diodato has not established a

genuine issue of material fact sufficient to survive summary judgment.

Notwithstanding months of discovery and ample opportunity to develop a record,

Diodato is before the court with nothing but his own unsupported assertion that he

is entitled to some vague and ill articulated amounts of compensation and

reimbursements. (Doc. 74 at 23 (quoting Producer Plan but contending, with

reliance only on his own assertion, that Wells Fargo did not follow it); id. at 24

(requesting expenses of "approximately" $750)). Diodato fails to direct the court to

any objective evidence in support of his assertions. The Third Circuit has held

repeatedly that such a showing cannot survive a motion for summary judgment.

See Kirleis v. Dickey, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)

("Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."); Pobodnik v. United States Postal Serv., 409 F.3d 589, 594 (3d Cir. 2005) ("[T]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."); Solomon v. Soc'y of Auto. Eng'rs, 41 F. App'x 585, 586 (3d Cir. 2002) (affirming court's entry of judgment when "the only evidence in support of [plaintiff's] claims was [plaintiff's] own testimony"). Cf. O'Donnell v. Passport Health Commc'ns., No. 11-3231, 2013 U.S. Dist. LEXIS 51432, at *27-41 (E.D. Pa. Apr. 10, 2013) (denying summary judgment when parties submitted competing evidence as to when compensation was "earned" and amount of expenses for which plaintiff sought reimbursement was established by evidentiary support).[10]  This evidentiary deficiency compounds Diodato's failure to plead these claims in the first instance and is fatal to the compensation aspect of his breach of contract claim.

This evidentiary vacuum similarly defeats Diodato's WPCL claim in Count IV.  Claims for violation of the WPCL are entirely contingent upon proof of a contractual obligation to pay wages and an attendant breach of that obligation. See Sheils v. Pfizer, Inc., 156 F. App'x 446, 451-52 (3d Cir. 2005) (affirming district

---

[10] Not only did O'Donnell involve conflicting evidence, including testimony, expense reports, exact figures, and summaries of the nature of the expenses, the issue of unpaid reimbursable expenses was also not contested by the defendant. O'Donnell, 2013 U.S. Dist. LEXIS 51432, at *41 ("[W]ith respect to O'Donnell's claim that Passport has not reimbursed her for certain business expenses, Passport has not briefed this issue at all.  Summary judgment is therefore denied as to this issue.").

court's grant of summary judgment on WPCL claim when plaintiff failed to prove that defendant breached a contractual obligation to pay him earned wages); see also Oberneder v. Link Comp. Corp., 696 A.2d 148, 150 (Pa. 1997) ("The [WPCL] provides employees a statutory remedy to recover wages . . . *that are contractually due to them.*" (emphasis added) (citing Killian v. McCulloch, 850 F. Supp. 1239, 1255 (E.D. Pa. 1994))).  Although Diodato does not expressly concede this point, he conflates his WPCL and breach of contract analyses in his opposition papers, implicitly agreeing that the claims rise and fall together.  (See Doc. 74 at 22-26).  For these reasons, the court will grant Wells Fargo's motion with respect to the WPCL claim.

### b.      Failure to Implement and Perform TSA in Good Faith

Diodato states a separate claim against Wells Fargo for breach of the implied duty of good faith and fair dealing under the TSA.  Pennsylvania courts have adopted Section 205 of the Restatement (Second) of Contracts, which provides that every contract imposes a "limited duty" of good faith and fair dealing on each party in performing and enforcing the same.  See Baker v. Lafayette College, 504 A.2d 247, 254 (Pa. Super. Ct. 1985) (citing and adopting RESTATEMENT (SECOND) OF CONTRACTS § 205).[11]  This implied "duty to perform contractual obligations in good faith does not evaporate merely because the contract is an employment contract,

---

[11] Section 205 provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  RESTATEMENT (SECOND) OF CONTRACTS, § 205.

and the employee has been held to be an employee at will."[12]  <u>Somers v. Somers</u>, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992).

The court observes as a threshold matter that much of Diodato's claim pertains to conduct predating the contract's execution.  (Doc. 74 at 17 (emphasizing Wells Fargo's efforts to obtain his signature and use the TSA to prevent his access to the market)).  Diodato contends, for example, that Wells Fargo entered into the TSA with the intent of using pretextual grounds to terminate his employment, (Doc. 1-2 ¶ 123), and that this intent violates the covenant of good faith.  Notably, the duty of good faith and fair dealing does not extend to contract formation and pertains only to the performance of the contract itself.  <u>See</u> <u>Novinger Grp., Inc. v. Hartford</u> <u>Ins., Inc.</u>, 514 F. Supp. 2d 662, 671-72 (M.D. Pa. 2007) (Conner, C.J.) (dismissing claim based solely on defendant's actions and intentions preformation) (quoting <u>Falbo v. State Farm Life Ins. Co.</u>, No. 96-5540, 1997 U.S. Dist. LEXIS 2687, at *7 (E.D. Pa. Mar. 13, 1997)).  To the extent Diodato contends Wells Fargo violated the duty of good faith and fair dealing by inducing him to execute the agreement in the first instance, the law forecloses his claim.

---

[12] Diodato concedes, as noted *supra*, that his employment with Wells Fargo was at will.  (<u>See</u> Diodato Dep. 40:17-41:18).  He posits that his bad faith claim is based not on any contract of employment, but rather on Wells Fargo's performance under the TSA.  (<u>See</u> Doc. 74 at 21 ("Count II of the Complaint sounds in breach of the duty of good faith and fair dealing.  It pertains to [Wells Fargo's] failure to honestly and fairly perform the TSA. . . .Count II pertains to [Wells Fargo's] failure to implement the terms of the TSA fairly and honestly.")).

In any event, a claim for breach of the duty of good faith and fair dealing does not lie separately from the terms of the contract itself.  See Burton v. Teleflex, Inc., 707 F.3d 417, 432-33 (3d Cir. 2013); see also Stewart v. SWEPI, LP, 918 F. Supp. 2d 333, 343-44 (M.D. Pa. 2013) ("Pennsylvania does not recognize a separate cause of action for breach of the covenant 'because such a breach is merely a breach of contract.'") (citing LSI Title Agency, Inc. v. Eval. Servs., Inc., 951 A.2d 384, 392 (Pa. Super. Ct. 2008) (observing that a "claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim")); McHale v. NuEnergy Grp., No. 01-4111, 2002 U.S. Dist. LEXIS 3307, at *22-23 (E.D. Pa. Feb. 27, 2002) (concluding that "Pennsylvania law would not recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action separate from the breach of contract claim").  Stated differently, a good faith and fair dealing claim "must always be grounded in a specific provision of a contract" rather than some abstract or perceived social policy.  Nationwide Ins. Indep. Contrs. Ass'n v. Nationwide Mut. Ins. Co., 518 F. App'x 58, 62 (3d Cir. 2013) (citing Burton, 707 F.3d at 433; Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000) (noting that a claim for breach of the duty of good faith and fair dealing cannot be "divorced from the specific clauses of the contract")); see also Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank, 801 A.2d 1248, 1253 (Pa. Super. Ct. 2002) (explaining that duty of good faith arises under the law of contracts rather than implicating the broader social policies of the law of torts).

28

These principles defeat Diodato's claim. Diodato offers broad, conspirative theories with respect to Wells Fargo's intentions in terminating his employment but does not identify a single provision of the TSA that Wells Fargo allegedly violated. (See Doc. 74 at 19-21). Nothing about Diodato's claim is "grounded in a specific provision of the contract." Nationwide Ins., 518 F. App'x at 62. Indeed, rather than identifying a breach of the TSA, Diodato's summary of the law devolves rapidly into an attack of Wells Fargo's reasons for terminating his employment. (See Doc. 74 at 19-21). Diodato clearly attempts to circumvent the at-will employment doctrine by transforming a prohibited wrongful termination claim into a contractual bad faith claim.[13] Pennsylvania courts have expressly rejected such a course. See Donahue v. FedEx, 753 A.2d 238, 243 (Pa. Super. Ct. 2000) (holding that appellant "cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will

---

[13] Diodato's own testimony confirms this point. Diodato was asked during his deposition what he believes "Wells Fargo has done to breach the covenant of good faith and fair dealing?" (Diodato Dep. 56:8-10). He replied that he "was employed with Wells Fargo and all their purchases through 35 years," that he "worked hard every week . . . [and] gave up family life for this company," and that, despite his efforts, Wells Fargo terminated his employment. (Id. 59:19-21 ("The contract is me working for this company and giving my soul to it. Their breach of contract was they tossed me aside like a sack of potatoes.")). In fact, the bulk of his argument simply rehashes the circumstances of his termination. (See Doc. 74 at 19 ("[Wells Fargo's] decision to terminate [Diodato] was riddled with bad intentions. . . ."); id. ("[F]rom the outset . . . , [Wells Fargo] desired to terminate [Diodato]."); id. at 19-21 (lodging various attacks at Wells Fargo's stated reasons for terminating him)). And when asked specifically to identify whether "Wells Fargo breached a contract with you" and to identify the written contract provisions, Diodato responded: "It's a contract of humanity. This company lost its humanity." (Diodato Dep. 69:1-3).

employment relationship"); cf. Baker, 504 A.2d at 255-56 (allowing at-will employee to proceed on breach of implied duty of good faith and fair dealing theory when employee identified specific provision of the contract that employer allegedly failed to perform in good faith).  Because Diodato has failed to establish a bad faith breach of any provision of the TSA, the court will grant Wells Fargo's motion for summary judgment with respect to his bad faith claim.

### 3.    *Counts V & VI: Defamation and Commercial Disparagement*

Diodato asserts the following in support of his defamation and commercial disparagement claims: (1) that Voltz informed John Zukus ("Zukus"), a Wells Fargo business manager, that Diodato's actions were "not in Wells Fargo's best interests"; (2) that he "painted a picture" to Richard Fiato ("Fiato"), head underwriting officer for North Pointe Insurance ("North Pointe"), that Diodato's "business practices were suspect and that he was insubordinate"; and (3) that Wells Fargo's counsel advised both Christian Baker and AIA by letter that Diodato was in violation of the TSA by contacting and soliciting his former clients to transfer their insurance business to Christian Baker or AIA.  (Doc. 74 at 26-27).

To prevail on a claim for defamation, Diodato must adduce evidence of the following elements: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff

from its publication; and (7) abuse of a conditionally privileged occasion.  See 42 Pa.
Cons. Stat. § 8343(a).[14]  Wells Fargo argues that Diodato's evidence insufficiently
identifies the communications at issue and consequently fails to satisfy the element
of publication.  Wells Fargo also posits that each statement is privileged.

Record evidence supports Diodato's allegation that Voltz informed Zukus
that Diodato's actions "weren't in the best interests of Wells Fargo" on the Monday
following Diodato's termination.  (Doc. 73-14, Zukus Dep. 49:25-50:4, ("Zukus Dep.")
Mar. 8, 2013).  Similarly, Richard Fiato states in his affidavit that Voltz, on more
than one occasion, "was more than willing to discuss Diodato's termination and
paint a picture that [Diodato's] business practices were suspect and [Diodato] was
insubordinate."  (Doc. 73-5, Fiato Dec. ¶¶ 12-13 ("Fiato Dec.") (stating that "I told
[Voltz] that I did not want to 'be involved in that soup,' but he insisted on talking to
me about it")).  McKendrick states that the North Pointe meeting took place on
August 3, 2011.  (See Doc. 73-2, McKendrick Dec. ¶ 4 ("McKendrick Dec.")).  Wells
Fargo admits that it sent multiple cease and desist letters to both Christian Baker
and AIA highlighting Diodato's perceived violations of the TSA.  (See Doc. 79 at 18
(acknowledging that it sent letters to alleged "co-conspirators" seeking assistance in
obtaining Diodato's cmpliance with the TSA)).  Hence, Diodato sufficiently

---

[14] The parties and the court agree that the legal standard applicable to a
commercial disparagement claim is identical to that applicable to a defamation
claim.  (Doc. 64 at 24; Doc. 74 at 29); also QVC, Inc. v. MJC Am., Ltd., No. 08-3830,
2011 U.S. Dist. LEXIS 78063, at *11 (E.D. Pa. July 18, 2011) ("The legal standards
applicable to defamation claims . . . are appropriately applied in the determining
the sufficiency of . . . claim[s] for commercial disparagement.").

identifies the statements at issue for present purposes—the inquiry for the court's resolution is whether the communications are sufficient to establish defamation liability.

### a.    Voltz Statement to Zukus

Wells Fargo contends first that Voltz's statement to Zukus regarding the reasons for Diodato's termination is merely a statement of opinion not subject to civil liability for defamation.  (See Doc. 79 at 16-17).  As a general rule, statements of opinion are immune from defamation liability.  See Green v. Mizner, 692 A.2d 169, 174 (Pa. Super. Ct. 1997) (citing Mathias v. Carpenter, 687 A.2d 1, 2-3 (Pa. Super. Ct. 1991)).  In order for a statement of opinion to be actionable, it must be reasonably understood to "imply the existence of undisclosed defamatory facts." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 481 (E.D. Pa. 2010) (quoting Veno v. Meredith, 515 A.2d 571, 575 (Pa. Super. Ct. 1986)); see also RESTATEMENT (SECOND) OF TORTS § 566 ("A defamatory communication may consist of a statement of an opinion but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.")).  Whether a given statement is opinion or fact is a question of law for the trial court.  Green, 692 A.2d at 174.

The court concludes that Voltz's statement that Diodato's actions "weren't in the best interests of Wells Fargo" is ambiguous, obscure, and, does not imply the existence of *specific* defamatory facts.  Mzamane, 693 F. Supp. 2d at 481 (quoting Veno, 515 A.2d at 575); see also RESTATEMENT (SECOND) OF TORTS § 566.  The

opinion, without contextual facts, neither "impugns" Diodato's professional skills as an insurance broker, see Baker, 504 A.2d at 251, nor implies his violation of any particular duty or other responsibility as a Wells Fargo employee. (See Zukus Dep. 49:25-50:4 (offering no factual context other than "best interests" statement)).  In other words, this statement of Voltz's personal opinion, even if taken as true by another, is non-specific and fails to imply any fact that impairs Diodato's business reputation or raises questions as to his professional character.  See Baker, 504 A.2d at 251 (only communications that "ascribe[] to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession'" are defamatory (quoting RESTATEMENT (SECOND) OF TORTS § 573)).  The court will grant summary judgment to Wells Fargo with respect to this claim.

### b.    Voltz Statement to Fiato

Wells Fargo raises only one argument with respect to Voltz's statements to Fiato during the North Pointe meeting: it posits that Diodato fails to sufficiently identify an actual statement in support of his claim.  (See Doc. 64 at 23-25; Doc. 79 at 15-16).  On the present record, the court must disagree.

Wells Fargo's argument that the North Pointe statement is insufficiently identified as to time, place, and content is refuted by the record.  With respect to the North Pointe meeting, the record establishes that:  (1) the meeting occurred on August 3, 2011, (McKendrick Dec. ¶ 4); (2) the meeting was attended by Voltz, Fiato, and Linda Petrella, (id.); and (3) during the meeting, Voltz explicitly described

33

Diodato as "insubordinate" and his business practices as "suspect."[15]  (Fiato Dec. ¶

12).  The court rejects Wells Fargo's position that the record does not identify a

"specific defamatory statement" attributable to it or its management.

Wells Fargo also cites Holewinski v. Children's Hosp., 649 A.2d 712 (Pa.

Super. Ct. 1994), as support for its position that Diodato's evidence falls short of

identifying "specific defamatory statement(s) attributable to [Wells Fargo]."  (Doc.

79 at 15).  Holewinski is entirely distinguishable and, in fact, weighs in Diodato's

favor.  Holewinski was hired in 1980 by Children's Hospital and received "position

upgrades" (ostensibly promotions) over time.  Id. at 714.  In 1991, the hospital hired

a new chief of pediatric neurosurgery who advised the plaintiff that he planned to

increase the qualifications for her position, which would effectively disqualify her

for the job.  Id.  The new chief did so in April of 1992, and plaintiff was terminated

effective June 30, 1992; her replacement was hired and commenced employment in

mid-May of 1992.  Id.  At the motion to dismiss stage, the plaintiff urged the court to

draw inferences of defamation from the "nature of her termination," the meeting

between herself and the new chief of pediatric neurosurgery, her replacement's

hiring, and her replacement's actions while Holewinski was still employed.  Id. at

715-16.  The court held that failure "to set forth a specific statement" is fatal to a

---

[15] The court notes that truth is an affirmative defense to a defamation claim.
Bobb v. Kraybill, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986) ("Truth is an absolute
defense to defamation in Pennsylvania.") (citing Hepps v. Phila. Newspaper, Inc.,
485 A.2d 374, 377 (Pa. 1984).  It is within the proper purview of the jury to determine
whether Wells Fargo will establish sufficient support for that defense.

defamation claim.  Id. at 716.  In other words, inferences and an opportunity for

defamation are insufficient, and plaintiffs must identify a specific statement in

order to prevail.  See id.  As noted *supra*, and in stark contrast to Holewinski,

Diodato has set forth specific statements made by Voltz during the August 3, 2011,

meeting.  (See McKendrick Dec. ¶ 4; Fiato Dec. ¶¶ 12-13).  This claim survives

summary judgment.

### c.   Cease and Desist Letters

Diodato also bases his defamation claim on the contents of various letters

sent by Wells Fargo to Christian Baker and AIA following his termination.  These

letters advised Christian Baker and AIA principals of the terms of Diodato's TSA

and alleged that Diodato was violating the TSA with the assistance of Christian

Baker and AIA.  The Christian Baker letter provided, in pertinent part, as follows:

> [Wells Fargo] has received information indicating that, since
> becoming affiliated with Christian Baker, [Diodato] has
> violated and is continuing to violate the contractual
> obligations outlined above, and is doing so with Christian
> Baker's aid and assistance.  [Wells Fargo] has learned that
> [Diodato] has contacted many of [Wells Fargo's] clients by
> telephone and in person and solicited them to transfer their
> insurance business away from [Wells Fargo]. [Wells Fargo]
> has also learned that [Diodato] has advised clients that, if
> they are not comfortable transferring their business to
> Christian Baker, he can "park" their business at [AIA] for a
> period of time. . . . This conduct directly violates [Diodato's]
> post-employment contractual, statutory, and common-law
> obligations . . . .

(Doc. 67-6 at 12-15).  Wells Fargo additionally demanded that Christian Baker

ensure Diodato's compliance with the terms of the TSA and advised that it would

enforce its rights in court if necessary.  (Id.)  The content and demands of the AIA letter are virtually identical to the language of the Christian Baker letter quoted above, with relevant substitutions pertinent to the recipient.  (Id. at 16-19).  Wells Fargo additionally informed AIA that it had "learned that Diodato has advised clients that, while he does not currently work for AIA, he will be working for AIA in the future and . . . can continue to provide insurance brokerage services to them despite the fact that he does not work for AIA."  (Id. at 18).

Wells Fargo does not deny authoring or mailing these letters.  (See Doc. 79 at 18).  Rather, it contends that each of the letters is subject to a competitors privilege.  (Id.)  It directs the court to Gresh v. Potter McCune Co., 344 A.2d 540 (Pa. Super. Ct. 1975) as support.  Gresh involved similar facts: a plaintiff salesman voluntarily terminated his employment with defendant company after executing a restrictive covenant including non-solicitation provisions and thereafter went to work for a competitor and commenced solicitation of the defendant company's customers.  Id. at 541.  The defendant company sent a cease and desist letter to plaintiff's new employer, advising that it intended to take all legal steps necessary to ensure plaintiff complied with terms of the restrictive covenant.  Id.  In response, plaintiff's new employer terminated his employment, and plaintiff brought suit against the defendant company alleging, inter alia, that the cease and desist letter constituted defamation.  Id.  The court held that because the defendant company had introduced evidence of the interest it sought to protect in sending its cease and desist letters, a conditional privilege applied.  Id. at 543.  The plaintiff failed to prove

that the defendant company had abused this privilege, and, therefore, the court granted summary judgment in the defendant's favor. Id.

Wells Fargo argues that, like the employer in Gresh, it reasonably believed that its efforts were necessary to protect its interests as identified in the TSA. (Doc. 79 at 18 ("Just like the former employer in Potter McCune, [Wells Fargo] reasonably believed that it had a protectable interest – its customer relationships, goodwill, and customer information – that it had protected by restrictive covenant, and sent a letter to Christian Baker and AIA in an effort to prevent further breaches.")). Such interests are legitimate and protectable. See infra at 45-47. Diodato offers only the conclusory contention that no privilege attaches to the cease and desist letters because "Christian Baker and AIA were competitors" of Wells Fargo and "Diodato was employed by Christian Baker" when the letters were sent. (Doc. 74 at 29). Diodato fails to demonstrate that Wells Fargo abused the competitive privilege. See Wilson, 2013 U.S. Dist. LEXIS 33555, at *28-29 (citing Miketic, 675 A.2d at 329). For this reason, the court is compelled to grant Wells Fargo's motion with respect to the cease and desist letters.

### 4. Count VIII: Unjust Enrichment

To prevail on a claim for unjust enrichment, Diodato must prove that: (1) he conferred a benefit on Wells Fargo; (2) that Wells Fargo appreciated the benefit; and (3) under the circumstances, "it would be inequitable for the defendant to retain the benefit without payment" to Diodato. Mass. Mut. Life Ins. Co. v. Curley, 459 F.3d 101, 108 (3d Cir. 2012). In Count VIII, Diodato asserts a claim for unjust

enrichment and seeks "restitution from [Wells Fargo] for all amounts received by

[Wells Fargo] on and after May 16, 2011, deriving from commissions from customers

and/or business contacts on account of insurance placed by Diodato."  (Doc. 1-2 ¶

172).  Diodato further contends that genuine issues of fact exist with respect to

whether Wells Fargo unjustly continued to generate commissions on accounts

which Diodato had "worked for thirty-six (36) years to build as part of his business

and his life."  (Doc. 74 at 32).

With respect to commissions allegedly earned and owing, Diodato

transparently attempts to restate his contract claim as one sounding in equity.  (See

Doc. 74 at 22 (contending, in support of breach of contract claim, that Wells Fargo

failed to pay him commission due and owing under the Producer Plan); Doc. 74 at

30 (same in support of unjust enrichment claim)).  The court concluded *supra* that

Diodato's breach of contract claim lacks evidentiary support and does not survive

summary judgment.  See *supra* at 19-26.  Diodato's unjust enrichment claim as to

unpaid commissions is entirely contingent upon proof of the same facts underlying

his breach of contract claim.  His failure to offer any evidence beyond his own *ipse*

*dixit* assertions is fatal to this aspect of his unjust enrichment claim.  See Pobodnik,

409 F.3d at 594 (3d Cir. 2005) (plaintiffs "must present more than just 'bare

assertions, conclusory allegations or suspicions' to show the existence of a genuine

issue" to survive summary judgment); see also Kirleis, 560 F.3d at 161; Solomon, 41

F. App'x at 586.

Diodato also alleges that Wells Fargo has been unjustly enriched by continuing to generate commissions on accounts that he secured and serviced throughout his thirty-six (36) year career with Wells Fargo and its predecessor entities.  (Doc. 74 at 32).  In his opposition materials, Diodato fails to provide any record support for this assertion.  (See id.)  Indeed, the record is devoid of proof that Wells Fargo continued to unjustly receive any benefit after Diodato's termination.  (See id.)  Moreover, courts routinely reject unjust enrichment claims when a plaintiff is hired for a particular purpose, accomplishes that purpose, and is compensated for those services.  See, e.g., McGoldrick v. TruePosition, Inc., 623 F. Supp. 2d 619, 625 (E.D. Pa. 2009) (rejecting unjust enrichment claim for additional compensation when "[plaintiff] performed his job and was compensated with his salary") (quoting Herbst v. Gen. Accident Ins. Co., No. 97-8085, 1999 U.S. Dist. LEXIS 15807, at *27 (E.D. Pa. Sept. 30, 1999) (dismissing claim when plaintiff "has not shown that he  did anything more than work to the best of his abilities for defendant as he was engaged to do"); Herald v. Star Blends, Inc., No. 90-6810, 1991 U.S. Dist. LEXIS 11248, at *8 (E.D. Pa. Aug. 13, 1991) (citing Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987)).  Absent proof that Wells Fargo realized a benefit and failed to compensate Diodato in return, the court is compelled to enter summary judgment in Wells Fargo's favor as to this claim.

### 5.   *Count IX: Declaratory Judgment*

In Count IX, Diodato seeks a declaratory judgment that the TSA is void or voidable: (1) for lacking consideration; (2) as not being executed contemporaneous

to any change in his employment terms or conditions; (3) as not being incident to an employment relationship; (4) as unnecessary for the protection of Wells Fargo; (5) as being an unlawful attempt by Wells Fargo to oppress Diodato's attempts to solicit business contacts he generated throughout his career; (6) as being unreasonable in scope; (7) as being unreasonable in duration; (8) for Wells Fargo's failure to comply with its material terms; and (9) as a result of fraud in the inducement. (Doc. 1-2 at ¶¶ 178-185). In his brief in opposition to summary judgment, Diodato abandons many of these theories, asserting only that it is void for fraud in the inducement and that the TSA is not necessary to protect a legitimate Wells Fargo interest. (See Doc. 74 at 36-38 (contending that the covenant is "born out of fraud [and] used to protect interests that are not lawfully capable of protection" and as such unenforceable)).

The parties agree as to the principal terms of the TSA. (See Doc. 65 ¶¶ 18, 20; Doc. 73 ¶ 20). It provides, in relevant part, that in consideration for continued employment with Wells Fargo, the ability to participate in a new compensation plan, and an increased commission on new and net new revenue in 2010, Diodato, upon termination, will return to Wells Fargo all confidential information obtained throughout his employment and will refrain from soliciting Wells Fargo's customers and employees for a period of two (2) years. (Diodato Dep. Ex. C at 1-2). In its motion and brief, Wells Fargo contends that the TSA is supported by adequate consideration insofar as it was executed in exchange for Diodato's continued employment and a one percent (1%) additional commission on new revenue and net new revenue, (Doc. 74 at 27-28), and that it was reasonably limited in scope and

duration.[16]  (Id. at 30-31).  It also contends that the agreement is reasonably

necessary for the protection of valuable interests, and that Diodato cannot establish

that the TSA is the product of fraud.  (Id. at 28-30).  The court addresses Wells

Fargo's arguments in turn.

### a.      Fraudulent Inducement

The gist of the action doctrine bars a common law claim for fraudulent

inducement arising from the TSA.  See *supra* at 13-18.  Hence, Diodato's allegations

of fraud are most appropriately analyzed in the context of the TSA itself, as part of

his declaratory judgment claim.  Diodato argues that the TSA is void because Wells

Fargo "obtained his signature by way of false representations" and "falsely

represented to [Diodato] that he had to sign the TSA as a condition of retaining his

employment."  (Doc. 74 at 36).  Wells Fargo responds that Diodato adduced no

evidence of fraud, and that the evidence proffered is barred by the parol evidence

rule.  (See Doc. 64 at 12-18, Doc. 79 at 4-7).  The court agrees with Wells Fargo that

the parol evidence rule bars each representation cited by Diodato.

The parol evidence rule states that when the parties have adopted a writing

as a final and complete expression of their agreement, any "evidence of negotiations

leading to the formation of the agreement is inadmissible" to explain or contradict

---

[16] Diodato abandoned both his claim that the TSA is overly broad—in scope
or duration—and his consideration argument by failing to raise either in opposition
to Wells Fargo's motion.  Nissan World, LLC, 2014 U.S. Dist. LEXIS 59902, at *31;
Mills, 589 F. Supp. 2d at 558 n.15.  Hence, the court does not address Wells Fargo's
refutation of these issues.

the language of the agreement.  <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d

425, 436-37 (Pa. 2004); <u>1726 Cherry St. P'ship v. Bell Atl. Props.</u>, 653 A.2d 663, 666

(Pa. Super. Ct. 1995).  Pennsylvania law, which the parties agree is applicable here,

distinguishes between fraud in the inducement and fraud in the execution for the

purpose of the parol evidence rule.  Parol evidence is admissible when a party

alleges fraud in the execution, that is, that a previously agreed-upon term was

omitted from the final contract "because of fraud, accident, or mistake."  <u>Yocca</u>,

854 A.2d at 437.  Parol evidence is inadmissible based on a claim of fraud in the

inducement of the contract, *i.e.*, that an opposing party made false representations

that induced the complaining party to agree to the contract."  <u>Id.</u> at 437 n.26.  In

other words, "a party cannot justifiably rely upon prior oral representations, yet

sign a contract denying the existence of those representations."  <u>1726 Cherry St.

P'ship</u>, 653 A.2d at 669 (quoting <u>McGuire v. Schneider, Inc.</u>, 534 A.2d 115, 119 (Pa.

Super. Ct. 1987)).  To hold otherwise would allow the "parol evidence rule [to]

become a mockery, because all a party to the written contract would have to avoid,

modify or nullify it would be to aver (and prove) that the false representations were

fraudulently made."  <u>Rahemtulla v. Hassam</u>, 539 F. Supp. 2d 755, 773 (M.D. Pa. Mar.

24, 2008).

     In the instant matter, the TSA contains a clear and unambiguous integration

clause. (Diodato Dep. Ex. A. at 3 ("This Agreement supersedes any prior written or

verbal agreements pertaining to the subject matter herein, and is intended  to be a

final expression of our Agreement with respect only to the terms contained

herein."). The presence of an integration clause alone encourages application of the parol evidence rule. See, e.g., HCB Contractors v. Liberty Place Hotel Assocs., 652 A.2d 1278, 1279-80 (Pa. 1995) (applying rule to plaintiff's attempt to avoid waivers of mechanics liens set forth in an integrated contract).

Moreover, Diodato does not allege fraud in the execution. Rather, he styles his claim as one of fraudulent inducement and contends that Wells Fargo made certain false representations prior to the TSA's execution to induce his agreement to the same. Specifically, he contends that he was misled with regard to whether the TSA was a condition of continued employment with Wells Fargo and as to the additional consideration to be received as consideration for signing the TSA. (See Doc. 74 at 36). Each of the purported representations relate to subjects specifically addressed in the written contract, falling squarely within the parameters of the parol evidence prohibition. (See Diodato Dep. Ex. A at 1 (acknowledging TSA is executed "[i]n consideration for my continued employment by a Wells Fargo company"); Diodato Dep. Ex. E at 1 ("For the 2010 Plan year only (January 1, 2010 through December 31, 2010), [Diodato] will receive the following consideration for signing the new TSA . . . : Additional 1% on New Revenue and Additional 1% on Net New Revenue.")). Diodato's claim is based not on a fraud extraneous to the contract or in its execution; it rests entirely on subject matter addressed by the express terms of the agreement. Evidence of these pre-contract representations is expressly excluded by the parol evidence rule. See Yocca, 854 A.2d at 437 n.26 (parol evidence is unequivocally inadmissible based on a claim of fraud in the

43

inducement).  The TSA speaks directly to the representations that Diodato challenges, and, therefore, the parol evidence rule necessarily bars Diodato's claim that the TSA is void for fraud in the inducement.

### b.    Protectable Interests

Diodato contends that the TSA was not reasonably necessary to protect Wells Fargo's interests.  (Doc. 74 at 37).  To ensure that post-employment covenants do not unduly burden a former employee's ability to earn a living, courts in Pennsylvania enforce such restrictions only when they are: (1) incident to an employment relation between the parties to the covenant; (2) reasonably necessary for the protection of the employer; and (3) reasonably limited in geographic and temporal scope.  Quaker Chem. Corp. v. Varga, 509 F. Supp. 2d 469, 476 (E.D. Pa. Sept. 4, 2007) (quoting Sidco Paper Co. v. Aaron, 351 A.2d 250, 252 (Pa. 1976)); see also Insulation Corp. of Am. v. Brobston, 667 A.2d 729, 733 (Pa. Super. Ct. 1995)). The burden is on the employee seeking to avoid the covenant "to demonstrate that [it] is 'unreasonable.'" Id. (quoting John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169 (Pa. 1977)); see also Fisher Bioservices, Inc. v. Bilcare, Inc., No. 06-567, 2006 U.S. Dist. LEXIS 34841, at *10 (E.D. Pa. May 31, 2006) (noting that the "party challenging the validity of the agreement bears the burden of proving

that the terms of the non-compete and other restrictions are . . . unreasonable.").[17]

In his brief, Diodato challenges only the second of these elements.  (Doc. 74 at 37-38 (alleging fraud and lack of reasonable and legitimate interests)).

Post-employment restrictions are enforceable as "reasonably necessary for the protection of the employer when . . . narrowly tailored to protect an employer's legitimate interests."  Colorcon, Inc. v. Lewis, 792 F. Supp. 2d 786, 799 (E.D. Pa. 2011) (citing PharMethod, Inc. v. Caserta, 382 F. App'x 214, 220 (3d Cir. 2010)); see Hess v. Gebhard & Co., 808 A.2d 912, 920 (Pa. 2002) ("Fundamental . . . to any enforcement determination is the threshold assessment that there is a legitimate interest of the employer to be protected as a condition precedent to the validity of a covenant not to compete.").  Recognized, protectable interests include trade secrets, confidential information, good will, and unique or extraordinary skills.  Hess, 808 A.2d at 920-21 (observing that covenants not to compete "for some other purpose, as for example, eliminating or repressing competition or to keep the employee from competing so that the employer can gain an economic advantage, . . . will not be enforced") (citing Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 846 (Pa. 1957)); see also Wellspan Health v. Bayliss, 869 A.2d 990, 995 (Pa. Super. Ct. 2005).

---

[17] Diodato states: "The summary judgment standard requires a far more exacting level of evidence to justify the exercise of a restrictive covenant.  Here, with a restrictive covenant born out of fraud, used to protect interests that are not lawfully capable of protection, *[Wells Fargo] has failed to sustain the standard of evidence necessary to support summary judgment.*"  (Doc. 74 at 37-38 (emphasis added)).  This statement misapprehends the burden of proof, which lies with Diodato as the party seeking to prove the covenant's unreasonableness.  Quaker Chem. Corp., 509 F. Supp. 2d at 476 (quoting John G. Bryant Co., 369 A.2d at 1169).

Customer goodwill is protectable by contractual covenant, even if it is acquired

solely through the efforts of an at-will employee. Sidco Paper, 351 A.2d at 252-53

("An employer's right to protect [its] interest in customer goodwill acquired through

the efforts of an employee is well-established in Pennsylvania."); Wellspan Health,

869 A.2d at 995 (same); see also Novus Franchising, Inc. v. Taylor, 795 F. Supp. 122,

128 (M.D. Pa. 1992) ("When a contract is terminated and a non-competition clause is

enforced, courts have recognized that there will necessarily be an extinguishment

of some good will the employee . . . built up on [his or] her own.  The courts enforce

the covenants nonetheless."); Boldt Mach. & Tools, Inc. v. Wallace, 366 A.2d 902,

905 (Pa. 1976) (noting that "employer has a [protectable] interest in the customer

goodwill developed by its employees").  Diodato's contention that Wells Fargo has

no protectable interest in preserving its clientele base and customer goodwill falls to

the great weight of authority.

The right of employers to protect their various interests by contractual

covenant is not without limitation, however, and such covenants are to be strictly

construed particularly when an employee involuntarily separates from his former

employer.  See Colorcon, Inc., 792 F. Supp. 2d at 797 (quoting All-Pak, Inc. v.

Johnston, 694 A.2d 347, 351 (Pa. Super. Ct. 1997) ("Non-competition agreements

restrain an employee's ability to practice his or her chosen trade [and] they are

'strictly construed against the employer.'")).  Thus, recognition of Wells Fargo's

legitimate interests does not end the court's inquiry, because the TSA must be

narrowly tailored to protect its articulated interests.  PharMethod, 382 F. App'x at

220 ("A restrictive covenant is reasonably necessary for the protection of the employer when it is narrowly tailored to protect an employer's legitimate interests.").

Notwithstanding a restriction's general enforceability, courts in equity may limit "enforcement . . . to those portions of the restrictions which are reasonably necessary for the protection of the employer." Plate Fabrication & Mach'g, Inc. v. Beiler, No. 05-2276, 2006 U.S. Dist. LEXIS 52, at *17-18 (E.D. Pa. Jan. 3, 2006) (quoting Sidco Paper, 351 A.2d at 254); PharMethod, 382 F. App'x at 219 (quoting Hess, 808 A.2d at 917) (although deemed enforceable upon satisfaction of the Sidco Paper test, restrictive covenants are "'not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living'"). A restrictive covenant with protections broader than necessary is not *per se* unenforceable, but a court, "to be faithful to Pennsylvania law, should not enforce any covenant that is manifestly unreasonable in light of the employer's needs and is excessively burdensome to the employee in pursuing his occupation." PharMethod, 382 F. App'x at 219. In other words, a court may "blue pencil" restrictive covenants which impose broader than necessary post-employment prohibitions by enforcing only those portions reasonably necessary to protect the employer. See PharMethod, 382 F. App'x at 220 (citing Sidco Paper, 351 A.2d at 254).

The court will exercise this discretion in the matter *sub judice*. In doing so, the court must balance Wells Fargo's legitimate need to protect its investment

against Diodato's right to earn a living in his chosen field, and then determine whether the TSA "comes reasonably close to that balance." Victaulic Co. v. Tieman, 499 F.3d 227, 238 (3d Cir. 2007) (citing Hess, 808 A.2d at 917). As a threshold matter, the court observes that sections (a) and (b) of the TSA's non-solicitation clause are narrowly tailored, and neither party raises overbreadth concerns. Provisions which temporarily limit a former employee's ability to solicit his former customers and coworkers have long been enforced by Pennsylvania courts, and Diodato does not dispute this fact. It is not the non-solicitation clause, but rather the non-acceptance clause, which compels the court to exercise its authority to modify the TSA.

The non-solicitation clause contained in Wells Fargo's TSA goes well beyond prohibiting the active solicitation of clients and prohibits the passive acceptance of *unsolicited* former clients who contact Diodato unilaterally. (See Diodato Dep. Ex. C at 2). Pursuant to its terms, Diodato may not "directly or indirectly . . . [a]ccept insurance business from or provide Competitive Products/Services to customers of [Wells Fargo] . . . with whom [he] had Material Contact, and/or . . . were clients or customers of [Wells Fargo] within six (6) months prior to [his] termination of employment." (Id.) By its disjunctive terms, the TSA prohibits Diodato from accepting the business of both clients of Wells Fargo with whom he had material contact and any customer that was a customer of *any* Wells Fargo affiliate or entity within six months preceding his termination, regardless of whether Diodato had contact with that client. (Id.)

48

This non-acceptance provision unreasonably restrains not only Diodato's ability to earn a living following his termination, see PharMethod, 382 F. App'x at 219-20 (courts carefully scrutinize a covenant "that prevents a former employee from earning a living") (quoting Hess, 808 A.2d at 917), but more broadly restrains free trade. By its express terms, the provision purports to restrict the liberty of third parties who, of their own volition, unilaterally seek Diodato's services. Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moose, 528 A.2d 1351, 1355 (Pa. Super. Ct. 1987) (affirming trial court's preliminary injunction enjoining only solicitation and noting that "the persons who would be most affected by a more encompassing order would be the innocent customers . . . who would be denied the privilege of entrusting their commodities business to the broker of their choice"). Wells Fargo certainly has a legitimate interest in protecting its customer base. See Sidco Paper, 351 A.2d at 254 (recognizing employers' interests in ensuring that a terminated employee does not abscond with its customer base). It has the right to do so through reasonable and narrowly tailored covenants. See PharMethod, 382 F. App'x at 220. However, Wells Fargo has not shown an interest so compelling as to warrant a blanket prohibition on Diodato's acceptance of *unsolicited* business from former customers, restricting both his ability to earn a living and the free will of the businesses that he formerly serviced. Cf. Latuszewski v. VALIC Fin. Advisors, Inc., No. 03-0540, 2007 U.S. Dist. LEXIS 93329, at *40 (W.D. Pa. Dec. 19, 2007) (covenant not unreasonably restrictive when the employees (1) could still earn a living by servicing customers who they had not serviced in the year prior to leaving the

49

employer and (2) could still service former customers who sought them out unilaterally after leaving their employer).

The court concludes that the TSA's post-employment prohibition on accepting the unsolicited business of former clients is broader than necessary to protect against the concerns articulated by Wells Fargo.  (<u>See</u> Doc. 64 at 39 (noting that intent of TSA is to protect against solicitation of customer goodwill generated through Diodato's efforts in his capacity as an employee of Wells Fargo)).  The court will exercise its discretion and strike the non-acceptance provision from the TSA.  Accordingly, as to Diodato's declaratory judgment claim, the court will grant Wells Fargo's motion to the extent it pertains to the non-solicitation provisions of the TSA but deny the motion as to the non-acceptance provision.  The latter provision is unenforceable as a matter of law.

### 6.   *Count XI: Violation of the Lanham Act*

In Count IX, Diodato asserts a claims for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).[18]  Diodato bases this claim on: (1) Wells Fargo's continued use of his name on its website for nearly seven (7) months after Diodato's termination, and (2) Wells Fargo's continued use of his name as its representative in *Roller Skating Business*, the Roller Skating International Association magazine, after his termination.  (Doc. 74 at 41).  To survive summary judgment as to this claim, Diodato must demonstrate genuine issues of fact as to whether: (1) Wells Fargo made false or misleading statements about its services or Diodato's services; (2) "there is actual deception or at least a tendency to deceive a substantial portion of the intended audience"; (3) the deception is material; (4) "the advertised goods traveled in interstate commerce"; and (5) "there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."  Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011).  Importantly, Lanham Act

---

[18] Diodato initially asserted claims for both false advertising and false designation of origin in violation of the Lanham Act.  (See Doc. 1-2 ¶ 193 ("[The] . . . Lanham Act violations are for the false designation of origin . . . . and/or was a false or misleading description or representation of fact . . . .")).  In its opening brief, Wells Fargo challenges only Diodato's false designation of origin claim, (Doc. 64 at 32-43), under the mistaken assumption that Diodato had not stated a claim for false advertising, (see Doc. 79 at 22).  Diodato responds that his "primary claim under the Lanham Act" is a false advertising claim, and he pursues only that claim in his opposition papers.  (See Doc. 74 at 39; id. at 42 (noting Wells Fargo "erroneously analyzed" a false designation claim in its opening brief rather than Diodato's claim for false advertising) ).  Given Diodato's failure to respond to Wells Fargo's false designation challenges, the court deems that claim to be abandoned and addresses only Diodato's false advertising claim.  See Nissan World, LLC, 2014 U.S. Dist. LEXIS 59902, at *31; Mills, 589 F. Supp. 2d at 558 n.15.

liability contemplates more than false descriptions or misrepresentations, and "extends to instances where the defendant creates a false impression." <u>Ames Pub. Co. v. Walker-Davis Pubs., Inc.</u>, 372 F. Supp. 1, 26 (E.D. Pa. 1974).

Wells Fargo argues in support of its motion only that Diodato failed to assert a claim for false advertising in his complaint and is precluded from pursuing such a claim now.  The court rejects this argument.  As noted *supra*, Diodato's complaint clearly contemplates a false advertising claim, noting that his Lanham Act claim is one for both false designation and "false or misleading description of representation or fact." (Doc. 1-2 ¶ 193).  Diodato also expressly states the statutory requirements of a false designation claim, (<u>see id.</u> ¶ 193(a) (quoting 15 U.S.C. § 1125(a)(1)(A))), and a false advertising claim, (<u>see id.</u> ¶ 193(b) (quoting 15 U.S.C. § 1125(a)(1)(B))).  Wells Fargo had notice of this claim from the very outset of this litigation.  (<u>See</u> Doc. 1-2 ¶ 193(b)).  Wells Fargo does not challenge the merits of Diodato's false advertising claim.  Accordingly, the court will deny its motion.

### 7.   *Count X: Unfair Competition*

Wells Fargo argues that Diodato's common law unfair competition claim fails as a matter of law because Diodato has failed to prove a violation of the Lanham Act.  (<u>See</u> Doc. 64 at 42-43).  Wells Fargo is correct to the extent it contends that the Pennsylvania common law of unfair competition generally tracks federal law.  <u>See Groupe SEB USA, Inc. v. Euro-Pro Op. LLC</u>, No. 14-137, 2014 U.S. Dist. LEXIS 66616, at *20 (W.D. Pa. May 15, 2014) ("Pennsylvania common law cause for unfair competition is identical to the Lanham Act without the federal requirement of

interstate commerce.") (quoting <u>R.J. Ants, Inc. v. Martinelli Enters., LLC</u>, 771 F.

Supp. 2d 475, 489 (E.D. Pa. 2011)).  The court concluded hereinabove that Diodato's

Lanham Act false advertising claim survives and will proceed to a jury trial.  <u>See</u>

*supra* at 51-52.  Diodato's common law claim for unfair competition similarly

survives summary judgment.

### 8. *Count VII: Unauthorized Use of Name or Likeness*

Wells Fargo also seeks summary judgment as to Diodato's statutory claim for

unauthorized use of his name, in violation of Pennsylvania's Unauthorized Use of

Name or Likeness statute.  See 42 PA. CONS. STAT. § 8316.  Section 8316 creates a

cause of action for any "person whose name or likeness has commercial value and

is used for any commercial or advertising purpose without written consent . . . ." <u>Id.</u>

The statute defines "name or likeness" as any "attribute of a natural person that

serves to identify that natural person to an ordinary, reasonable viewer or listener,

including, but not limited to, name, signature, photograph, image, likeness, voice,

or a substantially similar imitation of one or more thereof."  <u>Id.</u> § 8316(e).  It defines

"commercial value" as "valuable interest in a person's name or likeness" developed

by investing "time, effort and money."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Facenda v. N.F.L. Films, Inc.</u>,

542 F.3d 1007, 1027 (3d Cir. 2008).  The statute defines "commercial or advertising

purpose" to include, *inter alia*, "the public use or holding out of a natural person's

name or likeness . . .  on or in connection with the offering for sale or sale of a

product, merchandise, goods, services or businesses."  42 PA. CONS. STAT. § 8316(e).

Diodato argues that Wells Fargo's use of his name on its website and in a nationally distributed industry magazine post-termination violates the statute.  (Doc. 74 at 41).

The parties dispute whether Diodato has sufficiently established commercial value in his name for purposes of unauthorized use liability.  (Doc. 64 at 43; Doc. 74 at 43-44).  Diodato contends that he "is not merely a salesperson" but rather is the "'Godfather' of the bowling insurance industry." (Doc. 74 at 44 (citing Doc. 65 ¶ 11)). The record reveals that Diodato has developed long-standing personal relationships with many of the clients he serviced while working for Wells Fargo, and he argues that, in the context of the roller skating and bowling alley insurance businesses, his name "has significant commercial value." (Id. (citing Doc. 65 ¶¶ 12-13, 17)).  Diodato states that he developed this book of business "long before he was ever affiliated with [Wells Fargo]." (Doc. 73 ¶ 12 (quoting Diodato Dec. ¶ 15)).  He avers that: (1) he spent his own money supporting various fundraising activities; (2) he entertained contacts at annual industry meetings; and (3) he paid $12,000 annually from his own commission revenue to account for costs relating to Wells Fargo's endorsement of the BPAP.  (Id. ¶ 6).  He asserts that this evidence[19] would allow a trier of fact to find that he expended time, effort, and money "in excess of what any salesperson does to generate customers." Majorsky v. Douglas, 58 A.3d 1250, 1263 (Pa. Super. Ct. 2012).

_____

[19] Commercial value inquiries are typically fact-intensive and ill-suited for summary judgment.  See Tillery v. Leonard & Sciolla, LLP, 521 F. Supp. 2d 346, 351 (E.D. Pa. 2007) ("The determination of whether a plaintiff's name has commercial value . . . [is a] factual determination[] not really appropriate for summary judgment.")).

The court agrees: on this record, a jury could reasonably find that Diodato undertook substantial efforts to establish and maintain a reputation in the bowling and family entertainment center industry, expending personal time, money, and efforts over more than thirty (30) years to create value and trust in his name.  See Eagle v. Moran, No. 11-4303, 2013 U.S. Dist. LEXIS 34220, at *16-19 (E.D. Pa. Mar. 12, 2013) (claim survives summary judgment when plaintiff demonstrated that she invested time and effort in developing her reputation in the banking industry, that she published and presented on various banking issues, and that she had "extensive experience" and "generated substantial annual sales"); see also Lewis v. Marriott Int'l, Inc., 527 F. Supp. 2d 422, 428 (E.D. Pa. 2007) (at Rule 12(b)(6) stage, allegations that plaintiff invested time in creating a reputation from the early 1980s, invested money and effort in promoting and selling packages through the defendant, and generated substantial revenue are sufficient for unauthorized use claim).  The court will deny Wells Fargo's motion with respect to Diodato's unauthorized use claim.

### B.    Diodato's Motion for Summary Judgment

In addition to denying each of Diodato's principal claims, Wells Fargo asserts five of its own counterclaims for: breach of contract (Count I); misappropriation and misuse of trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 PA. CONS. STAT. § 5301 (Count II); unfair competition (Count III); conversion (Count IV); and tortious interference with prospective and existing business relations (Count V).  Diodato moves for summary judgment as to each of these claims.  The court addresses each count *seriatim*.

### 1.   *Count I: Breach of Contract*

Wells Fargo first asserts a claim against Diodato for breach of the TSA, specifically for violation of its non-solicitation, non-disclosure, and non-acceptance provisions.  (Doc. 5 ¶¶ 53-57).  Diodato raises three arguments with respect to this claim: (1) that Wells Fargo does not have standing to request injunctive relief and that, if it does, the doctrine of *laches* precludes such relief; (2) that Wells Fargo waived its right to request compensatory or punitive damages in the TSA; and (3) that Diodato did not breach the TSA.  (Doc. 68 at 4, 10, 21).

### a.   **Injunctive Relief**

Diodato's argument with respect to injunctive relief is two-fold: first, that Wells Fargo is without standing to enjoin him from servicing or soliciting former clients because it abandoned its insurance brokerage services and, second, that Wells Fargo delayed unreasonably in asserting its rights to enjoin any solicitation that did occur.  (Doc. 68 at 11-13).  Wells Fargo expressly acknowledges that it may no longer seek to enforce the non-solicitation restrictions of the TSA, which expired in May of 2013.  (Doc. 79 at 42 ("[Wells Fargo] is not seeking such relief in the form of an injunction; the non-solicitation provision is expired.")).  Instead, it seeks equitable relief, in the form of the return of certain intellectual property that Diodato allegedly took with him when  he left Wells Fargo.  (See id.)  Hence, the court will grant Diodato's motion on Wells Fargo's claim for injunctive relief pursuant to the TSA's non-solicitation provisions.

### b.    Actual Damages

Diodato next asserts that Wells Fargo waived its right to compensatory or punitive damages in the TSA and that, in any event, Wells Fargo failed to prove that it suffered financial damages to any degree of certainty.  Regarding waiver, Diodato cites the TSA's damages provision, which states, in pertinent part:

> Recognizing the irreparable nature of the injury that could be done by my violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be the proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company.

(Diodato Dep. Ex. A at 3).  Diodato contends that Wells Fargo "limited the scope of its remedy to injunctive relief only" such that its claim for legal damages must be dismissed.  Diodato directs the court to Haldeman v. Towers, Perrin, Forster & Crosby, 23 Phila. 427 (Pa. Ct. Com. Pl. 1992) as support for the proposition that a remedies provision in a non-solicitation agreement which provides for equitable relief, but is silent as to compensatory relief, prohibits a claim for legal damages. (See Doc. 80 at 24).

Haldeman offers persuasive instruction.  In Haldeman, the plaintiff employee accepted an opportunity to become a shareholder of his consulting firm and, by virtue of this acceptance, became subject to its bylaws.  Id. at 428-29.  The bylaws included a noncompetition clause with the following remedies provision:

> Should [the plaintiff] so compete, the obligation of the Corporation to make any payments either to him or his estate with reference to his stock shall be limited exclusively to repayment of the purchase price paid by the

> Stockholder for his Common Stock, and each Stockholder
> agrees that the loss to him of the appreciation, if any, on
> the value of the Common Stock . . . is an inadequate
> remedy to the Corporation on account of such default and
> that, as an additional and cumulative remedy, the
> Corporation may, in its discretion and for the protection of
> its goodwill and client relationships, seek and secure
> appropriate equitable relief, by injunction or otherwise, to
> ensure the performance by the former Stockholder of his
> obligation not to compete.

Id. at 429.  The bylaws further provided that any difference of opinion with respect to these terms would be submitted to arbitration.  Id.  Plaintiff subsequently left the firm and solicited his former clients in apparent violation of the noncompetition clause.  Id. at 427-29.  After the firm sought to arbitrate, plaintiff moved the Philadelphia Court of Common Pleas to enjoin arbitration, arguing that the damages provision was not amenable to varying interpretations and thus the dispute not appropriately subject to arbitration.  See id.

The court observed that the agreement clearly set forth the firm's available remedies, and that there is "no language . . . which provides for compensation to the employer for its losses."  Id. at 430-31.  It noted that the firm drafted the bylaws, and that plaintiff had neither a role in negotiating nor influence over their terms.  See id. at 431.  Reciting the oft-reiterated and cardinal principle of contract interpretation that ambiguities shall be construed against the drafter, the court concluded that "any doubt over whether  the clause in question entitles the defendant to collect money damages must be resolved against the defendant."  Id.

(emphasizing that the "well settled . . . rule of law governing the interpretation of a noncompetition clause requires an ambiguity to be construed against the drafter"). The court held that damages beyond those identified in the agreements' remedies clause were unavailable to the firm.  See Haldeman, 23 Phila. at 429.

Certainly, the TSA does not *expressly* limit Wells Fargo's right to legal damages.  However, the TSA's clear recognition that "money damages would be inadequate" and its provision only for injunctive and equitable relief under the broad heading of "Injunctive Relief and Damages" creates a patent ambiguity as to whether monetary damages were intended and are recoverable by Wells Fargo. (See Diodato Dep. Ex. A at 3).  In fact, the TSA is completely silent with respect to monetary damages, (see id.), casting serious doubt as to whether compensatory damages should be permitted.  Long established principles of contract interpretation require the court to construe such unclarities in post-employment restrictive covenants against their drafter.  See, e.g., Colorcon, Inc., 792 F. Supp. 2d at 797 ("[B]ecause non-competition agreements restrain an employee's ability to practice his or her chosen trade, they are 'strictly construed against the employer.'" (quoting All-Pak, Inc., 694 A.2d at 351); see also Synthes, Inc. v. Knapp, 978 F. Supp. 2d 450, 460 (E.D. Pa. 2013) (same).  As a result, the court is constrained to hold that the TSA does not contemplate an award of monetary damages and grant Diodato's motion for summary judgment to the extent it seeks dismissal of Wells Fargo's claim for the same.  Because Wells Fargo may still be entitled to equitable relief or

nominal damages upon proof of a breach, the court's finding is not fatal to Wells

Fargo's breach of contract claim.

### c.      Merits of the Breach of Contract Claim

Lastly, the court turns to the merits of Wells Fargo's claim for breach of the

TSA.  As noted above, to prevail on a breach of contract claim under Pennsylvania

law, a plaintiff must prove the existence of a contract, its essential terms, and the

defendant's breach of a duty imposed by those terms.  See Ware, 322 F.3d at 225

(quoting CoreStates Bank, 723 A.2d at 1058).  Diodato acknowledges that the TSA

strictly prohibits him from soliciting clients of Wells Fargo "with whom [he] had

Material Contact" and/or "were clients  . . . of Wells Fargo within six (6) months

prior to [his] termination of employment."  (See Diodato Dep. Ex. A at 2).  In Count

I of its counterclaim, Wells Fargo contends that Diodato breached this provision by

contacting his former clients following his termination and soliciting them to

transfer their business to his new employer.  (Doc. 1 ¶¶ 55-57).

Diodato maintains that he did not solicit clients that he previously managed

while working for Wells Fargo.  (Doc. 67 ¶ 47).  In response, Wells Fargo highlights

Diodato's own concession that he maintained close and regular contact with former

clients during the two-year non-solicitation period, (Doc. 77 ¶ 53), and that initial

records reveal that seventy-six (76) of the accounts he serviced at Wells Fargo had

transferred their business by June of 2013.  (Doc. 67 ¶ 73; Doc. 77 ¶ 73).  Diodato's

declaration about the nature of his communications with his former clients is vague

at best, (see Doc. 67 ¶ 48 ("Mr. Diodato freely acknowledges . . . that he maintained

long-standing personal connections with many of his contacts and regards many of these persons as personal friends."")), but the record evidence as a whole, viewed in the light most favorable to Wells Fargo as the non-movant, permits an inference that Diodato solicited his former clients in violation of the TSA.  (See Doc. 67 ¶ 73; Doc. 77 ¶¶ 53, 73, 65-69 (citing *inter alia* Doc. 75, Ex. A, Diodato PP (email response to Diodato from client noting that he "sent that request for transfer to Wells Fargo as you had asked")).  Genuine issues of fact persist with respect to whether Diodato *solicited* his former clients or whether Diodato merely *accepted* the business of his former clients when they approached him of their own free will.  In light of the court's reformation of the TSA's covenants, the former is violative of the TSA; the latter is not.  See *supra* at 44-50.  It is for the jury, not the court, to resolve these factual disputes and to determine exactly what role Diodato played in the transition of his former clients' business.  Summary judgment is denied as to this claim.

     **2.**    ***Count II: Misappropriation and Misuse of Trade Secrets in Violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA")***

Diodato's challenge to Wells Fargo's PUTSA claim takes two forms: first, that the gist of the action doctrine bars both the PUTSA claim and the remainder of Wells Fargo's common law tort claims and, second, that Wells Fargo has failed to establish the existence of trade secrets or reasonable efforts to protect them.

Wells Fargo responds to Diodato's gist of the action doctrine argument by observing that no court has ever applied the doctrine to bar statutory claims.  (See Doc. 75 at 29-30).  Indeed, at least three district courts within the Third Circuit have

declined to apply the doctrine to preclude statutory claims in light of the dearth of authority supporting such an application.  See Sproul Hill Assocs., L.P. v. Newell Rubbermaid Inc., No. 13-4998, 2013 U.S. Dist. LEXIS 177291, at *8-9 (E.D. Pa. Dec. 16, 2013) ("Counts III and IV [under the Hazardous Sites Cleanup Act and Clean Streams Law] are statutory claims, *not common law tort claims*.  Defendants fail to cite to any case dismissing statutory claims under the gist of the action doctrine." (emphasis added)); Knit With, 2009 U.S. Dist. LEXIS 98217, at *18-19 ("Defendants' briefs fail to cite any case where a federal court has dismissed a *sui generis* federal statutory claim [pursuant to the Racketeer Influenced and Corrupt Organizations Act] under the gist of the action doctrine as duplicative of a contract claim.  Given the absence of any other authority for Defendants' argument . . . the Court declines to dismiss Plaintiff's RICO claims."); Clark v. EMC Mortg. Corp., No. 08-1409, 2009 U.S. Dist. LEXIS 61181, at *18 (E.D. Pa. Jan. 29, 2009) (rejecting application to statutory claims under Pennsylvania's Fair Debt Collection Practices Act and Unfair Trade Practices and Consumer Protection Law ("UTPCPL")); see also Sarsfield v. CitiMortgage, Inc., 707 F. Supp. 2d 546, 556 (M.D. Pa. 2010) (applying gist of the action doctrine to common law tort claims but declining to apply it to UTPCPL claims).  Absent compelling argument in support of Diodato's novel application of the doctrine, this court is similarly disinclined to apply the gist of the action doctrine to Wells Fargo's statutory claim for misappropriation of trade secrets.

62

Diodato alternatively argues that Wells Fargo fails to identify any trade secrets or prove that it reasonably protected those secrets as required by the statute and by case law interpreting the same. (See Doc. 68 at 31-32). PUTSA defines "trade secrets" as follows:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 PA. CONS. STAT. § 5302. Diodato contends that Wells Fargo "has not identified what information it alleges constitutes a trade secret," failing to create issues of fact sufficient to survive summary judgment. (Doc. 68 at 31). He argues that Wells Fargo has not directed the court to a scintilla of evidence demonstrating that he misappropriated anything—let alone anything that constitutes a trade secret. (See id.; see also Doc. 80 at 7-12). On this point, the court must agree with Diodato.

The TSA defines the term "trade secret" to include: the names, addresses, and contact information of Wells Fargo's clients, as well as personal or financial information relating to those customers and information regarding, *inter alia*, account numbers, balances, maturity or expiration or renewal dates, and policies; any information concerning Wells Fargo's operations, including, *inter alia*, its

63

methods, services, pricing, costs, margins, markups, finances, business plans and strategies, decision making, marketing, policies, and procedures; and "any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs." (Diodato Dep. Ex. A at 1). Wells Fargo contends that by directing the court to the terms of the TSA, it has specifically identified the trade secrets at issue as: information concerning customers and potential customers; details of its customers' insurance needs and policies; non-public internal procedures, programs, and forms; non-public lists of prospective and insured customers; non-public information regarding such facts as habits and insurance needs of customers, locations, and descriptions of properties; expiration dates of policies; and insurance daily reports. (Doc. 76 at 11-12 (citing Doc. 5 ¶¶ 26, 39-44)). Wells Fargo cites only its pleading in enumerating these alleged trade secrets.

At this juncture, Wells Fargo cannot simply rest on the allegations of its counterclaim; rather, it must come forward with objective evidence that Diodato misappropriated information or property and that the information or property he took constitutes a trade secret as contemplated by Pennsylvania law. Wells Fargo's opposition falls short of this mark. Indeed, when challenged by Diodato to identify specifically the trade secrets that Diodato misappropriated, Wells Fargo cites only to the allegations of its counterclaim and its own personal definition of "trade secret" as set forth in the TSA. (Doc. 76 at 11-12 (citing Doc. 5 ¶¶ 26, 39-44)). Cf. Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 105 (3d Cir. 2010) (specifically

identifying secrets at issue as "code books containing the formulas and process parameters for all of [the employer's] products" and secret recipes and procedures for creating employer's unique product).  Wells Fargo directs the court to no record evidence to prove its *ipse dixit* assertion that the information generally identified in its pleading constitutes a trade secret[20] *or* that Diodato misappropriated or misused that information.  See Nationwide Mut. Ins. Co. v. Fleming, No. 99-1417, 2001 U.S. Dist. LEXIS 26739, at *27- (W.D. Pa. Oct. 2, 2001) (granting judgment to defendant employees when plaintiff employer failed to "proffer sufficient evidence . . . that there was a legally protectable trade secret involved").

On the Rule 56 record, analysis of Wells Fargo's claim is problematic.  Wells Fargo devotes two pages in opposition to Diodato's arguments.  Wells Fargo does not direct the court to any evidence tending to establish that Diodato retained and

---

[20] The information outlined in Wells Fargo's pleading ostensibly falls within the ambit of the statutory definition of "trade secret."  However, absent supporting evidence, the court cannot determine as a matter of law whether information allegedly misappropriated constitutes a trade secret for the purpose of statutory liability.  Cf. NOVA Chems., Inc. v. Sekisue Plastics Co., 579 F.3d 319, 327-28 & n.12 (3d Cir. 2009).  The Third Circuit in NOVA identified factors relevant to a trade secret analysis as, *inter alia*: "the extent to which it is known outside the owner's business; the extent to which it is known by employees and others within the owner's business; the extent of measures taken to guard the secrecy of the information; the value of the information to competitors; the effort or money expended to develop the information; and the ease or difficulty with which it could be properly acquired or duplicated."  Id. at 327 (quoting SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985)).  The factors identified by the Circuit in NOVA predate the adoption of PUTSA, but as the NOVA court observed, the courts "continue to look to this standard to determine whether information constitutes a trade secret under the statute."  NOVA, 579 F.3d at 328.  The total lack of evidence cited by Wells Fargo precludes any meaningful trade secret analysis by the court.

misappropriated unique, proprietary information falling within either PUTSA's or the TSA's definition of trade secrets. Wells Fargo's claim rests entirely on the allegations of its pleading, (see Doc. 75 at 11-13 (citing Doc. 5 ¶¶ 26, 39-44 (counterclaim)), which, at first blush, appears to present a *prima facie* case of trade secret misappropriation. It is one thing to allege misappropriation of a trade secret, which allows a claim to survive the Rule 12 stage. At this stage, however, Wells Fargo must cite *evidence*—beyond its own allegations—identifying each allegedly misappropriated trade secret and the manner in which that secret was misappropriated by Diodato to Wells Fargo's detriment.

As the court has reiterated throughout this opinion, the Rule 56 standard demands more: "to survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Pobodnik, 409 F.3d at 594; also Kirleis, 560 F.3d at 161. In other words, the conclusory allegations of Wells Fargo's pleadings are entirely insufficient to establish a genuine issue of material fact sufficient to survive summary judgment. See Pastore v. Bell Tel. Co. of Pa., 967 F.2d 846, 852 (3d Cir. 1992) (plaintiff "cannot rely upon conclusory allegations in its pleadings . . . to establish a genuine issue of material fact"). Wells Fargo is correct that at this stage, the court must view the evidence, and draw all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. (See Doc. 75 at 11 (citing Meyer-Chatfield v. Century Bus. Servicing, Inc., 732 F. Supp. 2d at 518)). To its detriment, Wells Fargo offers the court no evidence to so construe. It directs the court to no evidence

establishing exactly what information it believes Diodato misappropriated or the

manner in which he did so.  Given this complete failure of proof on a crucial

element of Wells Fargo's claim, the court is compelled to grant Diodato's motion.[21]

### 3.    Count III, IV, and V: Unfair Competition, Conversion, and Tortious Interference with Prospective Business Relations

Diodato lastly contends that the gist of the action doctrine bars Wells Fargo's

remaining tort claims for unfair competition, conversion, and tortious interference

with existing and prospective contractual relations.  (Doc. 68 at 15-20).  Wells Fargo

responds that its common law tort claims are not derivative of its claim for breach

of the TSA and that the gist of the action doctrine does not bar its claims.  (See Doc.

75 at 32-36).  The court disagrees.

As observed above, a breach of a contract does not constitute an actionable

tort unless the allegedly tortious conduct is "the gist of the action, the contract

being collateral."  eToll, 811 A.2d at 14.  The Pennsylvania Superior Court has

admonished that "a claim should be limited to a contract claim when 'the parties'

obligations are defined by the terms of the contracts . . . .", and not by the larger

social policies embodied by the law of torts.'"  Id. at 14 (quoting Bohler-Uddeholm

Am., Inc., 247 F.3d at 104).  In other words, when a common law tort claim is wholly

---

[21] In its effort to demonstrate a genuine issue of material fact, Wells Fargo incorporates the solicitation arguments raised earlier in its brief and alleges that Diodato used information about his former clients needs, policy renewal dates, policy expiration dates, and "much, much more," after his termination.  (Doc. 75 at 12-13).  Despite its conclusory assertions, Wells Fargo again offers no evidence specifically identifying the trade secrets at issue or the manner in which Diodato misappropriated them.

derivative of an alleged breach of contract, the court should not entertain both claims simultaneously.  See id.

The crux of Wells Fargo's claims against Diodato is his alleged violation of the TSA, specifically its provisions regarding non-solicitation and confidentiality. Wells Fargo's description of various claims in its opposition brief confirms this point.  (See Doc. 75 at 33).  In describing the proof requisite to support its tortious interference claim, Wells Fargo indicates that it "will draw on the deep well of evidence that Diodato attempted to, and did, direct [Wells Fargo's] clients to AIA, serviced their business at AIA, and was in continuous contact with [Wells Fargo's] customers throughout this period." (Id.)  This description is nothing more than Wells Fargo's breach of contract claim restated to eliminate references to the TSA. The conduct underlying Wells Fargo's tortious interference claim is quite plainly and specifically addressed by the non-solicitation provision of Diodato's agreement. eToll, 811 A.2d at 14 (quoting Bohler-Uddeholm Am., Inc., 247 F.3d at 104).  Just as Diodato's own common law fraud claims is barred by the gist of the action doctrine, so too are Wells Fargo's common law tort claims against Diodato.[22]

---

[22] Finally, to the extent Wells Fargo bases its unfair competition and conversion claims on the alleged misappropriation of trade secrets, those claims fail for the same reasons as Wells Fargo's PUTSA claim.

**V.**   **Conclusion**

For all of the foregoing reasons, the court will grant in part and deny in part

both motions.  An appropriate order will issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      September 8, 2014